# UNITED STATES *v.* MEZZANATTO

No. 93–1340.   Argued November 2, 1994—Decided January 18, 1995

THOMAS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, KENNEDY, GINSBURG, and BREYER, JJ., joined. GINSBURG, J., filed a concurring statement, in which O'CONNOR and BREYER, JJ., joined, *post*, p. 211. SOUTER, J., filed a dissenting opinion, in which STEVENS, J., joined, *post*, p. 211.

*Miguel A. Estrada* argued the cause for the United States. With him on the briefs were *Solicitor General Days, Assistant Attorney General Harris,* and *Deputy Solicitor General Kneedler.*

*Mark R. Lippman,* by appointment of the Court, 511 U. S. 1067, argued the cause and filed a brief for respondent.*

JUSTICE THOMAS delivered the opinion of the Court.

Federal Rule of Evidence 410 and Federal Rule of Criminal Procedure 11(e)(6) provide that statements made in the course of plea discussions between a criminal defendant and a prosecutor are inadmissible against the defendant. The court below held that these exclusionary provisions may not be waived by the defendant. We granted certiorari to resolve a conflict among the Courts of Appeals, and we now reverse.

I

On August 1, 1991, San Diego Narcotics Task Force agents arrested Gordon Shuster after discovering a methamphetamine laboratory at his residence in Rainbow, California. Shuster agreed to cooperate with the agents, and a few hours

---

*\*John J. Cleary* filed a brief for the National Association of Criminal Defense Lawyers et al. as *amici curiae* urging affirmance.

after his arrest he placed a call to respondent's pager. When respondent returned the call, Shuster told him that a friend wanted to purchase a pound of methamphetamine for $13,000. Shuster arranged to meet respondent later that day.

At their meeting, Shuster introduced an undercover officer as his "friend." The officer asked respondent if he had "brought the stuff with him," and respondent told the officer it was in his car. The two proceeded to the car, where respondent produced a brown paper package containing approximately one pound of methamphetamine. Respondent then presented a glass pipe (later found to contain methamphetamine residue) and asked the officer if he wanted to take a "hit." The officer indicated that he would first get respondent the money; as the officer left the car, he gave a prearranged arrest signal. Respondent was arrested and charged with possession of methamphetamine with intent to distribute, in violation of 84 Stat. 1260, as amended, 21 U. S. C. § 841(a)(1).

On October 17, 1991, respondent and his attorney asked to meet with the prosecutor to discuss the possibility of cooperating with the Government. The prosecutor agreed to meet later that day. At the beginning of the meeting, the prosecutor informed respondent that he had no obligation to talk, but that if he wanted to cooperate he would have to be completely truthful. As a condition to proceeding with the discussion, the prosecutor indicated that respondent would have to agree that any statements he made during the meeting could be used to impeach any contradictory testimony he might give at trial if the case proceeded that far. Respondent conferred with his counsel and agreed to proceed under the prosecutor's terms.

Respondent then admitted knowing that the package he had attempted to sell to the undercover police officer contained methamphetamine, but insisted that he had dealt only in "ounce" quantities of methamphetamine prior to his ar-

rest. Initially, respondent also claimed that he was acting merely as a broker for Shuster and did not know that Shuster was manufacturing methamphetamine at his residence, but he later conceded that he knew about Shuster's laboratory. Respondent attempted to minimize his role in Shuster's operation by claiming that he had not visited Shuster's residence for at least a week before his arrest. At this point, the Government confronted respondent with surveillance evidence showing that his car was on Shuster's property the day before the arrest, and terminated the meeting on the basis of respondent's failure to provide completely truthful information.

Respondent eventually was tried on the methamphetamine charge and took the stand in his own defense. He maintained that he was not involved in methamphetamine trafficking and that he had thought Shuster used his home laboratory to manufacture plastic explosives for the CIA. He also denied knowing that the package he delivered to the undercover officer contained methamphetamine. Over defense counsel's objection, the prosecutor cross-examined respondent about the inconsistent statements he had made during the October 17 meeting. Respondent denied having made certain statements, and the prosecutor called one of the agents who had attended the meeting to recount the prior statements. The jury found respondent guilty, and the District Court sentenced him to 170 months in prison.

A panel of the Ninth Circuit reversed, over the dissent of Chief Judge Wallace. 998 F. 2d 1452 (1993). The Ninth Circuit held that respondent's agreement to allow admission of his plea statements for purposes of impeachment was unenforceable and that the District Court therefore erred in admitting the statements for that purpose. We granted certiorari because the Ninth Circuit's decision conflicts with the Seventh Circuit's decision in *United States* v. *Dortch*, 5 F. 3d 1056, 1067–1068 (1993).

## II

Federal Rule of Evidence 410 and Federal Rule of Criminal Procedure 11(e)(6) (Rules or plea-statement Rules) are substantively identical. Rule 410 provides:

> "Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who . . . was a participant in the plea discussions: . . . (4) any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty . . . ."

The Ninth Circuit noted that these Rules are subject to only two express exceptions,[1] neither of which says anything about waiver, and thus concluded that Congress must have meant to preclude waiver agreements such as respondent's. 998 F. 2d, at 1454–1456. In light of the "precision with which these rules are generally phrased," the Ninth Circuit declined to "write in a waiver in a waiverless rule." *Id.*, at 1456.[2]

The Ninth Circuit's analysis is directly contrary to the approach we have taken in the context of a broad array of constitutional and statutory provisions. Rather than deeming waiver presumptively unavailable absent some sort of ex-

---

[1] A statement made by a criminal defendant in the course of plea discussions is "admissible (i) in any proceeding wherein another statement made in the course of the same . . . plea discussions has been introduced and the statement ought in fairness be considered contemporaneously with it, or (ii) in a criminal proceeding for perjury or false statement if the statement was made by the defendant under oath, on the record and in the presence of counsel." Fed. Rule Evid. 410. Accord, Fed. Rule Crim. Proc. 11(e)(6).

[2] Respondent also goes to great lengths to establish a proposition that is not at issue in this case: that the plea-statement Rules do not contain a blanket "impeachment" exception. We certainly agree that the Rules give a defendant the right not to be impeached by statements made during plea discussions, but that conclusion says nothing about whether the defendant may relinquish that right by voluntary agreement.

press enabling clause, we instead have adhered to the opposite presumption. See *Shutte* v. *Thompson,* 15 Wall. 151, 159 (1873) ("A party may waive any provision, either of a contract or of a statute, intended for his benefit"); *Peretz* v. *United States,* 501 U. S. 923, 936 (1991) ("The most basic rights of criminal defendants are . . . subject to waiver"). A criminal defendant may knowingly and voluntarily waive many of the most fundamental protections afforded by the Constitution. See, *e. g., Ricketts* v. *Adamson,* 483 U. S. 1, 10 (1987) (double jeopardy defense waivable by pretrial agreement); *Boykin* v. *Alabama,* 395 U. S. 238, 243 (1969) (knowing and voluntary guilty plea waives privilege against compulsory self-incrimination, right to jury trial, and right to confront one's accusers); *Johnson* v. *Zerbst,* 304 U. S. 458, 465 (1938) (Sixth Amendment right to counsel may be waived). Likewise, absent some affirmative indication of Congress' intent to preclude waiver, we have presumed that statutory provisions are subject to waiver by voluntary agreement of the parties. See, *e. g., Evans* v. *Jeff D.,* 475 U. S. 717, 730–732 (1986) (prevailing party in civil-rights action may waive its statutory eligibility for attorney's fees).

Our cases interpreting the Federal Rules of Criminal Procedure are consistent with this approach. The provisions of those Rules are presumptively waivable, though an express waiver clause may suggest that Congress intended to occupy the field and to preclude waiver under other, unstated circumstances. See *Crosby* v. *United States,* 506 U. S. 255 (1993); *Smith* v. *United States,* 360 U. S. 1 (1959). In *Crosby,* for example, we held that a defendant's failure to appear for any part of his trial did not constitute a valid waiver of his right to be present under Federal Rule of Criminal Procedure 43. We noted that the specific right codified in Rule 43 "was considered unwaivable in felony cases" at common law, and that Rule 43 expressly recognized only one exception to the common-law rule. 506 U. S., at 259. In light of the specific common-law history behind Rule 43 and the ex-

press waiver provision in the Rule, we declined to conclude that "the drafters intended the Rule to go further." *Id.*, at 260. Our decision in *Smith* followed a similar line of reasoning. It held that waiver of the indictment requirement embodied in Federal Rule of Criminal Procedure 7(a) is confined to the specific circumstances outlined in the Rule's text: "Rule 7(a) recognizes that this safeguard may be waived, but only in those proceedings which are noncapital." 360 U. S., at 9. Unlike Rules 43 and 7(a), however, the plea-statement Rules make no mention of waiver, and so *Crosby* and *Smith* provide no basis for setting aside the usual presumption.

The presumption of waivability has found specific application in the context of evidentiary rules. Absent some "overriding procedural consideration that prevents enforcement of the contract," courts have held that agreements to waive evidentiary rules are generally enforceable even over a party's subsequent objections. 21 C. Wright & K. Graham, Federal Practice and Procedure § 5039, pp. 207–208 (1977) (hereinafter Wright & Graham). Courts have "liberally enforced" agreements to waive various exclusionary rules of evidence. Note, Contracts to Alter the Rules of Evidence, 46 Harv. L. Rev. 138, 139–140 (1933). Thus, at the time of the adoption of the Federal Rules of Evidence, agreements as to the admissibility of documentary evidence were routinely enforced and held to preclude subsequent objections as to authenticity. See, *e. g., Tupman Thurlow Co.* v. *S. S. Cap Castillo,* 490 F. 2d 302, 309 (CA2 1974); *United States* v. *Wing,* 450 F. 2d 806, 811 (CA9 1971). And although hearsay is inadmissible except under certain specific exceptions, we have held that agreements to waive hearsay objections are enforceable. See *Sac and Fox Indians of Miss. in Iowa* v. *Sac and Fox Indians of Miss. in Okla.,* 220 U. S. 481, 488–489 (1911); see also *United States* v. *Bonnett,* 877 F. 2d 1450, 1458–1459 (CA10 1989) (party's stipulation to admissibility of document precluded hearsay objection at trial).

Indeed, evidentiary stipulations are a valuable and integral part of everyday trial practice. Prior to trial, parties often agree in writing to the admission of otherwise objectionable evidence, either in exchange for stipulations from opposing counsel or for other strategic purposes. Both the Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure appear to contemplate that the parties will enter into evidentiary agreements during a pretrial conference. See Fed. Rule Civ. Proc. 16(c)(3); Fed. Rule Crim. Proc. 17.1. During the course of trial, parties frequently decide to waive evidentiary objections, and such tactics are routinely honored by trial judges. See 21 Wright & Graham § 5032, at 161 ("It is left to the parties, in the first instance, to decide whether or not the rules are to be enforced. . . . It is only in rare cases that the trial judge will . . . exclude evidence they are content to see admitted"); see also *United States* v. *Coonan*, 938 F. 2d 1553, 1561 (CA2 1991) (criminal defendant not entitled "to evade the consequences of an unsuccessful tactical decision" made in welcoming admission of otherwise inadmissible evidence).[3]

## III

Because the plea-statement Rules were enacted against a background presumption that legal rights generally, and evidentiary provisions specifically, are subject to waiver by voluntary agreement of the parties, we will not interpret

---

[3] Respondent contends that a pretrial agreement to waive the exclusionary provisions of the plea-statement Rules is unlike a typical stipulation, which is entered into while the case is in progress, and is more like an extrajudicial agreement made outside the context of litigation. Brief for Respondent 39. While it may be true that extrajudicial contracts made prior to litigation trigger closer judicial scrutiny than stipulations made within the context of litigation, see 21 Wright & Graham § 5039, at 206, there is nothing extrajudicial about the waiver agreement at issue here. The agreement was made in the course of a plea discussion aimed at resolving the specific criminal case that was "in progress" against respondent.

Congress' silence as an implicit rejection of waivability. Respondent bears the responsibility of identifying some affirmative basis for concluding that the plea-statement Rules depart from the presumption of waivability.

Respondent offers three potential bases for concluding that the Rules should be placed beyond the control of the parties. We find none of them persuasive.

## A

Respondent first suggests that the plea-statement Rules establish a "guarantee [to] fair procedure" that cannot be waived. Brief for Respondent 12. We agree with respondent's basic premise: There may be some evidentiary provisions that are so fundamental to the reliability of the factfinding process that they may never be waived without irreparably "discredit[ing] the federal courts." See 21 Wright & Graham § 5039, at 207–208; see also *Wheat* v. *United States*, 486 U. S. 153, 162 (1988) (court may decline a defendant's waiver of his right to conflict-free counsel); *United States* v. *Josefik*, 753 F. 2d 585, 588 (CA7 1985) ("No doubt there are limits to waiver; if the parties stipulated to trial by 12 orangutans the defendant's conviction would be invalid notwithstanding his consent, because some minimum of civilized procedure is required by community feeling regardless of what the defendant wants or is willing to accept"). But enforcement of agreements like respondent's plainly will not have that effect. The admission of plea statements for impeachment purposes *enhances* the truth-seeking function of trials and will result in more accurate verdicts. Cf. *Jenkins* v. *Anderson*, 447 U. S. 231, 238 (1980) (once a defendant decides to testify, he may be required to face impeachment on cross-examination, which furthers the " 'function of the courts of justice to ascertain the truth' ") (quoting *Brown* v. *United States*, 356 U. S. 148, 156 (1958)); Note, 46 Harv. L. Rev., at 142–143 ("[A] contract to deprive the court of relevant testimony . . . stands on a different

ground than one admitting evidence that would otherwise have been barred by an exclusionary rule. One contract is an impediment to ascertaining the facts, the other aids in the final determination of the true situation") (footnote omitted). Under any view of the evidence, the defendant has made a false statement, either to the prosecutor during the plea discussion or to the jury at trial; making the jury aware of the inconsistency will tend to increase the reliability of the verdict without risking institutional harm to the federal courts.

Respondent nevertheless urges that the plea-statement Rules are analogous to Federal Rule of Criminal Procedure 24(c), which provides that "[a]n alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict." JUSTICE KENNEDY's concurrence in *United States* v. *Olano*, 507 U. S. 725, 741 (1993), suggested that the guarantees of Rule 24(c) may never be waived by an agreement to permit alternate jurors to sit in on jury deliberations, and respondent asks us to extend that logic to the plea-statement Rules. But even if we assume that the requirements of Rule 24(c) are "the product of a judgment that our jury system should be given a stable and constant structure, one that cannot be varied by a court with or without the consent of the parties," *id.*, at 742, the plea-statement Rules plainly do not satisfy this standard. Rules 410 and 11(e)(6) "creat[e], in effect, a privilege of the defendant," 2 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 410[05], p. 410–43 (1994), and, like other evidentiary privileges, this one may be waived or varied at the defendant's request. The Rules provide that statements made in the course of plea discussions are inadmissible "against" the defendant, and thus leave open the possibility that a defendant may offer such statements into evidence for his own tactical advantage. Indeed, the Rules contemplate this result in permitting admission of statements made "in any proceeding wherein another statement made in the course of the same . . . plea discussions *has been introduced* and the statement

ought in fairness be considered contemporaneously with it."
Fed. Rule Evid. 410(i) (emphasis added); accord, Fed. Rule
Crim. Proc. 11(e)(6)(i). Thus, the plea-statement Rules ex-
pressly contemplate a degree of party control that is conso-
nant with the background presumption of waivability.[4]

## B

Respondent also contends that waiver is fundamentally
inconsistent with the Rules' goal of encouraging voluntary
settlement. See Advisory Committee's Notes on Fed. Rule
Evid. 410 (purpose of Rule is "promotion of disposition of
criminal cases by compromise"). Because the prospect of
waiver may make defendants "think twice" before entering
into any plea negotiation, respondent suggests that enforce-
ment of waiver agreements acts "as a brake, not as a facilita-
tor, to the plea-bargain process." Brief for Respondent 23,
n. 17. The Ninth Circuit expressed similar concerns, noting
that Rules 410 and 11(e)(6) "aid in obtaining th[e] coopera-
tion" that is often necessary to identify and prosecute the
leaders of a criminal conspiracy and that waiver of the pro-
tections of the Rules "could easily have a chilling effect on
the entire plea bargaining process." 998 F. 2d, at 1455. Ac-
cording to the Ninth Circuit, the plea-statement Rules "per-
mit the plea bargainer to maximize what he has 'to sell'" by
preserving "the ability to withdraw from the bargain pro-
posed by the prosecutor without being harmed by any of his

---

[4] The Ninth Circuit relied on *Brooklyn Savings Bank* v. *O'Neil*, 324 U. S.
697 (1945), but that case is easily distinguishable in this regard. *Brooklyn
Savings Bank* held that certain statutory entitlements guaranteed to em-
ployees by the Fair Labor Standards Act of 1938 were unwaivable because
the structure and legislative history of the Act evinced a specific "legisla-
tive policy" of "prevent[ing] private contracts" on such matters. *Id.*, at
706. Respondent has identified nothing in the structure or history of the
plea-statement Rules that suggests that they were aimed at preventing
private bargaining; in fact, the above discussion suggests that the Rules
adopt a contrary view.

statements made in the course of an aborted plea bargaining session." *Ibid.*

We need not decide whether and under what circumstances substantial "public policy" interests may permit the inference that Congress intended to override the presumption of waivability, for in this case there is no basis for concluding that waiver will interfere with the Rules' goal of encouraging plea bargaining. The court below focused entirely on the *defendant's* incentives and completely ignored the other essential party to the transaction: the prosecutor. Thus, although the availability of waiver may discourage some defendants from negotiating, it is also true that prosecutors may be unwilling to proceed without it.

Prosecutors may be especially reluctant to negotiate without a waiver agreement during the early stages of a criminal investigation, when prosecutors are searching for leads and suspects may be willing to offer information in exchange for some form of immunity or leniency in sentencing. In this "cooperation" context, prosecutors face "painfully delicate" choices as to "whether to proceed and prosecute those suspects against whom the already produced evidence makes a case or whether to extend leniency or full immunity to some suspects in order to procure testimony against other, more dangerous suspects against whom existing evidence is flimsy or nonexistent." Hughes, Agreements for Cooperation in Criminal Cases, 45 Vand. L. Rev. 1, 15 (1992). Because prosecutors have limited resources and must be able to answer "sensitive questions about the credibility of the testimony" they receive before entering into any sort of cooperation agreement, *id.*, at 10, prosecutors may condition cooperation discussions on an agreement that the testimony provided may be used for impeachment purposes. See Thompson & Sumner, Structuring Informal Immunity, 8 Crim. Just. 16, 19 (spring 1993). If prosecutors were precluded from securing such agreements, they might well decline to enter into cooperation discussions in the first place

and might never take this potential first step toward a plea bargain.[5]

Indeed, as a logical matter, it simply makes no sense to conclude that mutual settlement will be encouraged by precluding negotiation over an issue that may be particularly important to one of the parties to the transaction. A sounder way to encourage settlement is to permit the interested parties to enter into knowing and voluntary negotiations without any arbitrary limits on their bargaining chips. To use the Ninth Circuit's metaphor, if the prosecutor is interested in "buying" the reliability assurance that accompanies a waiver agreement, then precluding waiver can only stifle the market for plea bargains. A defendant can "maximize" what he has to "sell" only if he is permitted to offer what the prosecutor is most interested in buying. And while it is certainly true that prosecutors often need help from the small fish in a conspiracy in order to catch the big ones, that is no reason to preclude waiver altogether. If prosecutors decide that certain crucial information will be gained only by preserving the inadmissibility of plea statements, they will agree to leave intact the exclusionary provisions of the plea-statement Rules.

---

[5] We cannot agree with the dissent's conclusion that the policies expressed in the Advisory Committee's Notes to the plea-statement Rules indicate congressional animosity toward waivability. The Advisory Committee's Notes *always* provide some policy justification for the exclusionary provisions in the Rules, yet those policies merely justify the default rule of exclusion; they do not mean that the parties can never waive the default rule. Indeed, the dissent is unwilling to accept the logical result of its approach, which would require a wholesale rejection of the background presumption of party control over evidentiary provisions. Hearsay, for example, is generally excluded because it tends to lack "trustworthiness," see Advisory Committee's Notes on Article VIII of the Fed. Rules of Evid., 28 U. S. C. App., p. 770, yet even the dissent concedes that the hearsay rules are "waivable beyond any question," *post*, at 212. Thus, the mere existence of a policy justification for the plea-statement Rules cannot provide a sound basis for rejecting the background presumption of waivability.

In sum, there is no reason to believe that allowing negotiation as to waiver of the plea-statement Rules will bring plea bargaining to a grinding halt; it may well have the opposite effect.[6]  Respondent's unfounded policy argument thus provides no basis for concluding that Congress intended to prevent criminal defendants from offering to waive the plea-statement Rules during plea negotiation.

## C

Finally, respondent contends that waiver agreements should be forbidden because they invite prosecutorial overreaching and abuse.  Respondent asserts that there is a "gross disparity" in the relative bargaining power of the parties to a plea agreement and suggests that a waiver agreement is "inherently unfair and coercive."  Brief for Respondent 26.  Because the prosecutor retains the discretion to "reward defendants for their substantial assistance" under the Sentencing Guidelines, respondent argues that defendants face an "'incredible dilemma'" when they are asked to accept waiver as the price of entering plea discussions. *Ibid.* (quoting *Green* v. *United States,* 355 U. S. 184, 193 (1957)).

The dilemma flagged by respondent is indistinguishable from any of a number of difficult choices that criminal defendants face every day.  The plea bargaining process neces-

---

[6] Respondent has failed to offer any empirical support for his apocalyptic predictions, and data compiled by the Administrative Office of the United States Courts appear to contradict them.  Prior to the Ninth Circuit's decision in this case (when, according to the Solicitor General, federal prosecutors in that Circuit used waiver agreements like the one invalidated by the court below, see Pet. for Cert. 10–11), approximately 92.2% of the convictions in the Ninth Circuit were secured through pleas of guilty or *nolo contendere.*  Annual Report of the Director, Administrative Office of the United States Courts, Judicial Business of the United States Courts 278 (1992) (Table D–7).  During that same period, about 88.8% of the convictions in all federal courts were secured by voluntary pleas.  *Id.,* at 276.

sarily exerts pressure on defendants to plead guilty and to abandon a series of fundamental rights, but we have repeatedly held that the government "may encourage a guilty plea by offering substantial benefits in return for the plea." *Corbitt* v. *New Jersey*, 439 U. S. 212, 219 (1978). "While confronting a defendant with the risk of more severe punishment clearly may have a 'discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable'—and permissible—'attribute of any legitimate system which tolerates and encourages the negotiation of pleas.'" *Bordenkircher* v. *Hayes*, 434 U. S. 357, 364 (1978) (quoting *Chaffin* v. *Stynchcombe*, 412 U. S. 17, 31 (1973)).

The mere potential for abuse of prosecutorial bargaining power is an insufficient basis for foreclosing negotiation altogether. "Rather, tradition and experience justify our belief that the great majority of prosecutors will be faithful to their duty." *Newton* v. *Rumery*, 480 U. S. 386, 397 (1987) (plurality opinion); see also *United States* v. *Chemical Foundation, Inc.*, 272 U. S. 1, 14–15 (1926) ("[I]n the absence of clear evidence to the contrary, courts presume that [public officers] have properly discharged their official duties"). Thus, although some waiver agreements "may not be the product of an informed and voluntary decision," this possibility "does not justify invalidating *all* such agreements." *Newton, supra,* at 393 (majority opinion). Instead, the appropriate response to respondent's predictions of abuse is to permit case-by-case inquiries into whether waiver agreements are the product of fraud or coercion. We hold that absent some affirmative indication that the agreement was entered into unknowingly or involuntarily, an agreement to waive the exclusionary provisions of the plea-statement Rules is valid and enforceable.

## IV

Respondent conferred with his lawyer after the prosecutor proposed waiver as a condition of proceeding with the plea

discussion, and he has never complained that he entered into the waiver agreement at issue unknowingly or involuntarily. The Ninth Circuit's decision was based on its *per se* rejection of waiver of the plea-statement Rules. Accordingly, the judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE GINSBURG, with whom JUSTICE O'CONNOR and JUSTICE BREYER join, concurring.

The Court holds that a waiver allowing the Government to impeach with statements made during plea negotiations is compatible with Congress' intent to promote plea bargaining. It may be, however, that a waiver to use such statements in the case in chief would more severely undermine a defendant's incentive to negotiate, and thereby inhibit plea bargaining. As the Government has not sought such a waiver, we do not here explore this question.

JUSTICE SOUTER, with whom JUSTICE STEVENS joins, dissenting.

This case poses only one question: did Congress intend to create a personal right subject to waiver by its individual beneficiaries when it adopted Rule 410 of the Federal Rules of Evidence and Rule 11(e)(6) of the Federal Rules of Criminal Procedure, each Rule providing that statements made during plea discussions are inadmissible against the defendant except in two carefully described circumstances? The case raises no issue of policy to be settled by the courts, and if the generally applicable (and generally sound) judicial policy of respecting waivers of rights and privileges should conflict with a reading of the Rules as reasonably construed to accord with the intent of Congress, there is no doubt that congressional intent should prevail. Because the majority ruling is at odds with the intent of Congress and will render the Rules largely dead letters, I respectfully dissent.

At first glance, the question of waivability may seem short on substance, given the unconditional language of the two virtually identical Rules, unsoftened by any provision for waiver or allusion to that possibility:

> "Except as otherwise provided in this rule, evidence . . . is not . . . admissible against the defendant who . . . was a participant in . . . plea discussions [of]

> .        .        .        .        .

> "any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty . . . [subject to two stated exceptions]." Fed. Rule Evid. 410.

Believers in plain meaning might be excused for thinking that the text answers the question. But history may have something to say about what is plain, and here history is not silent. If the Rules are assumed to create only a personal right of a defendant, the right arguably finds itself in the company of other personal rights, including constitutional ones, that have been accepted time out of mind as being freely waivable. See, *e. g., Johnson* v. *Zerbst*, 304 U. S. 458, 465 (1938) (Sixth Amendment right to counsel may be waived). The possibility that the Rules in question here do create such a personal right must, indeed, be taken seriously if for no other reason than that the Rules of Evidence contain other bars to admissibility equally uncompromising on their face but nonetheless waivable beyond any question. See Fed. Rule Evid. 802 (hearsay); Fed. Rule Evid. 1002 (best evidence).

The majority comes down on the side of waivability through reliance on the general presumption in favor of recognizing waivers of rights, including evidentiary rights. To be sure, the majority recognizes that the presumption does not necessarily resolve the issue before us, and the majority opinion describes some counterexamples of rights that are insulated against waiver, at least when waiver is expressly

prohibited or limited in terms that speak of waiver expressly. See *Crosby* v. *United States,* 506 U. S. 255 (1993); *Smith* v. *United States,* 360 U. S. 1 (1959). Still, the majority seems to assume that the express-waiver cases describe the only circumstances in which the recognition of waiver is foreclosed, and since the Rules in question here say nothing about "waiver" as such, the majority finds that fact really to be the end of the matter.

If there were nothing more to go on here, I, too, would join the majority in relying on the fallback rule of permissible waiver. But there is more to go on. There is, indeed, good reason to believe that Congress rejected the general rule of waivability when it passed the Rules in issue here, and once the evidence of such congressional intent is squarely faced, we have no business but to respect it (or deflect it by applying some constitutionally mandated requirement of clear statement). There is, of course, no claim in this case that Congress should be hobbled by any clear statement rule, and the result is that we are bound to respect the intent that the Advisory Committee's Notes to the congressionally enacted Rules reveal. See *Williamson* v. *United States,* 512 U. S. 594, 614–615 (1994) (KENNEDY, J., concurring in judgment) (citing cases in which Advisory Committee's Notes are taken as authoritative evidence of intent).

The fact underlying those Notes, and the fact of which all congressional and judicial action must take account in dealing with the possible evidentiary significance of plea discussions, is that the federal judicial system could not possibly litigate every civil and criminal case filed in the courts. The consequence of this is that plea bargaining is an accepted feature of the criminal justice system, and, "[p]roperly administered, it is to be encouraged." *Santobello* v. *New York,* 404 U. S. 257, 260 (1971). Thus the Advisory Committee's Notes on Rule 410 explained that "[e]xclusion of offers to plead guilty or *nolo* has as its purpose the promotion of disposition of criminal cases by compromise." 28 U. S. C. App.,

p. 750. "As with compromise offers generally, . . . free communication is needed, and security against having an offer of compromise or related statement admitted in evidence effectively encourages it." *Ibid.* The Advisory Committee's Notes on Rule 11(e)(6) drew the same conclusion about the purpose of that Rule and summed up the object of both Rules as being "to permit the unrestrained candor which produces effective plea discussions between the attorney for the government and the attorney for the defendant or the defendant when acting pro se." 18 U. S. C. App., p. 745 (1979 Amendment) (internal quotation marks omitted).

These explanations show with reasonable clarity that Congress probably made two assumptions when it adopted the Rules: pleas and plea discussions are to be encouraged, and conditions of unrestrained candor are the most effective means of encouragement. The provisions protecting a defendant against use of statements made in his plea bargaining are thus meant to create something more than a personal right shielding an individual from his imprudence. Rather, the Rules are meant to serve the interest of the federal judicial system (whose resources are controlled by Congress), by creating the conditions understood by Congress to be effective in promoting reasonable plea agreements. Whether Congress was right or wrong that unrestrained candor is necessary to promote a reasonable number of plea agreements, Congress assumed that there was such a need and meant to satisfy it by these Rules. Since the zone of unrestrained candor is diminished whenever a defendant has to stop to think about the amount of trouble his openness may cause him if the plea negotiations fall through, Congress must have understood that the judicial system's interest in candid plea discussions would be threatened by recognizing waivers under Rules 410 and 11(e)(6). See ABA Standards for Criminal Justice 14–3.4, commentary (2d ed. 1980) (a rule contrary to the one adopted by Congress "would discourage plea negotiations and agreements, for defendants would have

to be constantly concerned whether, in light of their plea negotiation activities, they could successfully defend on the merits if a plea ultimately was not entered"). There is, indeed, no indication that Congress intended merely a regime of such limited openness as might happen to survive market forces sufficient to supplant a default rule of inadmissibility. Nor may Congress be presumed to have intended to permit waivers that would undermine the stated policy of its own Rules. *Brooklyn Savings Bank* v. *O'Neil*, 324 U. S. 697, 704 (1945) ("Where a private right is granted in the public interest to effectuate a legislative policy, waiver of a right so charged or colored with the public interest will not be allowed where it would thwart the legislative policy which it was designed to effectuate").

It bears emphasizing that I would not suggest that there is only one reasonable balance possible between society's interest in encouraging compromise (which Congress thought to be served most effectively by refusing to recognize waivers of rights under these Rules) and society's interest in providing a vigorous adversary system when cases are tried (which may be served by recognizing waivers). The majority may be right that a better balance could have been struck than the one Congress intended. The majority may also be correct as a matter of policy that enough pleas will result even if parties are allowed to make their own rule of admissibility by agreement, with prosecutors refusing to talk without a defendant's waiver (unless such refusal overloads the system beyond its capacity for trials) and defendants refusing to waive (unless they are desperate enough to forgo their option to be tried without fear of compromising statements if the plea negotiations fail). But whether the majority is right or wrong on either score is beside the point; the policy it endorses is not the policy that Congress intended when it enacted the Rules. See *Touche Ross & Co.* v. *Redington*, 442 U. S. 560, 578 (1979) ("The ultimate question is one of congressional intent, not one of whether this Court thinks

that it can improve upon the statutory scheme that Congress enacted into law").

The unlikelihood that Congress intended the modest default rule that the majority sees in Rules 11(e)(6) and 410 looms all the larger when the consequences of the majority position are pursued. The first consequence is that the Rules will probably not even function as default rules, for there is little chance that they will be applied at all. Already, standard forms indicate that many federal prosecutors routinely require waiver of Rules 410 and 11(e)(6) rights before a prosecutor is willing to enter into plea discussions. Pet. for Cert. 10–11. See also *United States* v. *Stevens*, 935 F. 2d 1380, 1396 (CA3 1991) ("Plea agreements . . . commonly contain a provision stating that proffer information that is disclosed during the course of plea negotiations is . . . admissible for purposes of impeachment"). As the Government conceded during oral argument, defendants are generally in no position to challenge demands for these waivers, and the use of waiver provisions as contracts of adhesion has become accepted practice.[1] Today's decision can only speed the heretofore illegitimate process by which the exception has been swallowing the Rules. See, *e. g.*, *Guidry* v. *Sheet Metal Workers Nat. Pension Fund*, 493 U. S. 365, 377 (1990) (no exception should be made by Court because it would be too difficult to "carve out an exception that would not swallow the rule"); *United States* v. *Powell*, 469 U. S. 57, 68 (1984) (respondent's suggested exception to the *Dunn* rule "threat-

---

[1] The argument that the plea-bargaining system still works even though waiver has become the accepted practice does not answer the question whether Congress intended to permit a waiver rule. The Court's obligation is to interpret criminal procedure and evidentiary rules according to congressional intent. If the Government believes that the better rule is different from what is currently the law, the Government can petition Congress to change it. See *TVA* v. *Hill*, 437 U. S. 153, 194 (1978) ("Our individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute").

ens to swallow the rule"). See also 23 C. Wright & K. Graham, Federal Practice and Procedure 121–122, n. 7.3 (1994 Supp.) ("It would seem strange if the prosecutor could undermine the judicial policy, now endorsed by Congress, of encouraging plea bargaining by announcing a policy that his office will only plea bargain with defendants who 'waive' the benefits of Rule 410"). Accordingly, it is probably only a matter of time until the Rules are dead letters.

The second consequence likely to emerge from today's decision is the practical certainty that the waiver demanded will in time come to function as a waiver of trial itself. It is true that many (if not all) of the waiver forms now employed go only to admissibility for impeachment.[2] But although the erosion of the Rules has begun with this trickle, the majority's reasoning will provide no principled limit to it. The Rules draw no distinction between use of a statement for impeachment and use in the Government's case in chief. If objection can be waived for impeachment use, it can be waived for use as affirmative evidence, and if the Government can effectively demand waiver in the former instance, there is no reason to believe it will not do so just as successfully in the latter. When it does, there is nothing this Court will legitimately be able to do about it. The Court is construing a congressional Rule on the theory that Congress meant to permit its waiver. Once that point is passed, as it is today, there is no legitimate limit on admissibility of a defendant's plea negotiation statements beyond what the Constitution may independently impose or the traf-

---

[2] Waiver for impeachment use, however, has been applied broadly. For example, plea statements have been used to impeach a defendant's witnesses even where the defendant has chosen not to testify. See *United States* v. *Dortch*, 5 F. 3d 1056, 1069 (CA7 1993) ("[J]ust as the defendant must choose whether to protect the proffer statements by not taking the stand, the defendant must choose whether to protect the proffer by carefully determining which lines of questioning to pursue with different witnesses"), cert. pending *sub nom. Suess* v. *United States*, No. 93–7218.

fic may bear.   Just what the traffic may bear is an open question, but what cannot be denied is that the majority opinion sanctions a demand for waiver of such scope that a defendant who gives it will be unable even to acknowledge his desire to negotiate a guilty plea without furnishing admissible evidence against himself then and there.   In such cases, the possibility of trial if no agreement is reached will be reduced to fantasy.   The only defendant who will not damage himself by even the most restrained candor will be the one so desperate that he might as well walk into court and enter a naked guilty plea.   It defies reason to think that Congress intended to invite such a result, when it adopted a Rule said to promote candid discussion in the interest of encouraging compromise.