UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

C & H COMPANY, a corporation,
          *Plaintiff-Appellant,*

v.

ANDREW N. RICHARDSON, in his
individual capacity; JOHN H. KOZAK,
in his individual capacity; WILLIAM
F. VIEWEG, in his individual
capacity; JOHN E. "ED" BURDETTE,
II, in his individual capacity,
          *Defendants-Appellees,*

and

STATE OF WEST VIRGINIA BUREAU OF
EMPLOYMENT PROGRAMS, DIVISION OF
WORKERS COMPENSATION,
          *Party in Interest.*

No. 00-2388

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
Joseph Robert Goodwin, District Judge.
(CA-98-1079-2)

Argued: June 5, 2001

Decided: October 27, 2003

Before WIDENER and WILLIAMS, Circuit Judges, and
Robert R. BEEZER, Senior Circuit Judge of the
United States Court of Appeals for the Ninth Circuit,
sitting by designation.

Affirmed by unpublished per curiam opinion.

---

**COUNSEL**

**ARGUED:** James David Kauffelt, KAUFFELT & KAUFFELT, Charleston, West Virginia, for Appellant. Bryan Rex Cokeley, STEP-TOE & JOHNSON, Charleston, West Virginia; Stephen Mark Fowler, PULLIN, KNOPF, FOWLER & FLANAGAN, Charleston, West Virginia, for Appellees. **ON BRIEF:** H. Toney Stroud, STEPTOE & JOHNSON, Charleston, West Virginia, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

C & H Company (C & H) appeals from the district court's order granting summary judgment to Andrew N. Richardson, John H. Kozak, John E. Burdette II, and William F. Vieweg on C & H's claims under the West Virginia Constitution and 42 U.S.C.A. §§ 1983 and 1985(3) (West 2003) alleging disparate treatment in the application of certain West Virginia workers' compensation statutes. For the reasons that follow, we affirm.

I.

This case involves the application of regulations governing the payment of workers' compensation premiums for taxicab drivers in West Virginia. Pursuant to W. Va. Code § 23-2-1(a) (2002), "all persons, firms, associations and corporations regularly employing another person or persons for the purpose of carrying on any form of industry, service or business in [West Virginia] are employers . . . and are . . . required to subscribe to and pay premium taxes into the work-

ers' compensation fund for the protection of their employees." *See also* W. Va. Code § 23-2-1a(a) (defining an "employee" as a "person[ ] in the service of employers and employed by them for the purpose of carrying on the industry, business, service or work in which they are engaged"). Businesses having relationships only with independent contractors rather than "employees," however, are not required to pay premium taxes into the workers' compensation fund. *See generally C & H Taxi Co. v. Richardson*, 461 S.E.2d 442, 447-48 (W Va. 1995); *Myers v. Workmen's Comp. Comm'r*, 148 S.E.2d 664 (W. Va. 1966).

The operation of taxicabs in West Virginia is regulated by the West Virginia Public Service Commission (PSC). W. Va. Code §§ 24-2-1, 24A-1-1 (2001). Initially, all taxicab drivers in West Virginia were considered by the PSC to be employees of their taxicab companies. In 1981, however, "largely as the result of a financial decline in the taxicab industry, the West Virginia Taxicab Association petitioned the [PSC] for another option by which to do business," a petition that "resulted in the adoption by the [PSC] of P.S.C. W. Va. M.C. Form No. 55 [hereinafter Form 55]." *C & H*, 461 S.E.2d at 444. Form 55 is a form lease, by which device "many taxicab companies in West Virginia converted their employee drivers to lessees." *Id.* Form 55 is the mandatory method for an employer wishing to convert employee-drivers to lessees. *Id.* Drivers leasing their cabs under Form 55 were, until a 1990 change in policy discussed below, considered independent contractors.

At the times relevant to this action,[1] the Workers' Compensation Fund (the Fund) in West Virginia was under the jurisdiction of the Commissioner of the Bureau of Employment Programs (BEP). W. Va. Code § 23-1-1. The Fund was administered through the Workers' Compensation Division of the BEP (the Division).

---

[1]The management of West Virginia's workers' compensation fund was significantly revised by the state legislature in 2003. *See* 2003 W. Va. Acts ch. 27. We describe the structure as it existed at the times relevant here.

A.

With this background in place, we turn to the parties and issues before us. C & H is a taxicab company operating in Charleston, West Virginia. C & H is owned by Corey Brothers Inc., a corporation in turn owned by Steven J. Corey,[2] Robert D. Corey, Alexander Corey, and Richard G. Corey. The named defendants (collectively, Defendants) are as follows. Richardson was the Commissioner of the West Virginia Bureau of Employment Programs from 1990 to 1997. Kozak was Executive Secretary of the Fund from 1989-1991, Executive Director of the Division from 1991-1993, and Director of Legal Services for the Division from 1993-1998. Vieweg was Commissioner of the West Virginia BEP from 1997-2001. Burdette was Executive Director of the Division from 1993-2000. Also relevant to this appeal are two companies that are not parties. Taxi Service, Inc. (Taxi Service) is a taxicab service operating in Huntington, West Virginia and owned by Jamie Marlowe. Burns & Church Baggage and Yellow Cab Co., Inc. (Yellow Cab) is a taxicab service operating in Wheeling, West Virginia and owned by Michael Sobota. From the mid-1980s, C & H, Taxi Service, and Yellow Cab leased taxicabs to drivers for a set time for a flat fee paid by the leasing driver. Each of these companies used the PSC's Form 55 for this purpose.

Beginning in August 1989 and continuing through July 1990, a heated, public dispute arose between Steven Corey and the then-Governor of West Virginia, Gaston Caperton, regarding a contract to promote fairs and festivals (the festival contract) between Incorsel, a company owned by Steven Corey, and the Caperton administration. C & H alleges that this dispute, as well as subsequent litigation and the resulting acrimonious relationship between the Coreys and the Caperton administration, resulted in West Virginia officials applying Division regulations to it and refraining from applying the same regulations to two other similarly situated taxicab companies.

Specifically, C & H notes that on June 26, 1990, the Division issued a notice to all taxicab and limousine service employers, informing them that taxicab and limousine drivers operating under a PSC Form 55 would be presumed to be employees, rather than inde-

---

[2]Steven Corey is now deceased.

pendent contractors ("1990 regulation"). These notices came at the end of an internal inquiry begun in 1988 or 1989 and performed by Thomas Sweeney and then-Commissioner of the BEP Emily A. Spieler into the employment status of taxicab drivers for purposes of workers' compensation coverage. After reviewing the practices of cab companies and caselaw, the Legal Services department of the Division took the position in a memorandum dated April 1, 1990, that taxicab drivers should be treated as employees. On July 27, 1990 a notice of the policy was issued to "All Taxicab and Limousine Service Employers," with an effective date of July 1, 1990 (the 1990 Notice).

C & H, Yellow Cab, and Taxi Service filed Administrative Petitions contesting coverage under the new rule prescribed in the 1990 Notice.[3] Kozak scheduled C & H's hearing for December 13, 1990, Yellow Cab's hearing for January 24, 1991, and Taxi Service's hearing for February 14, 1991. After Taxi Service and Yellow Cab filed motions for continuances, the hearings in those matters were continued pending resolution of C & H's case. C & H's hearing was held as scheduled on December 13, 1990.

On April 23, 1991, the hearing examiner in C & H's administrative hearing found that C & H drivers should be considered employees for workers' compensation purposes. The Division affirmed this decision on May 22, 1991, as did the Circuit Court of Kanawha County, on January 26, 1994, and the Supreme Court of Appeals of West Virginia, on June 19, 1995, *see C & H*, 461 S.E.2d at 447. The Division thereafter began assessing workers' compensation premiums against C & H, and in September 1995, C & H began paying these premiums.[4] C & H paid over $200,000 in premiums between 1995 and 1999.

On June 26, 1991, after the decision of the hearing examiner in C & H's case but well before the decision by the Circuit Court of Kanawha County, Richardson met with Marlowe, the owner of Taxi Ser-

---

[3]C & H also filed, in July 1990, a declaratory judgment action in state court challenging the Division's notice. That case was ultimately dismissed.

[4]Neither Taxi Services nor Yellow Cab paid any premiums until 1999, after the present action was filed.

vice. Handwritten notes by Marlowe suggest that Richardson told Marlowe at that meeting to "do nothing" with respect to workers' compensation premiums. (J.A. at 527.)

Following the decision of the Supreme Court of Appeals of West Virginia in 1995, C & H turned its attention to determining whether the Division's new rules were being applied equally to all taxicab companies in the state. In October of 1996, C & H requested information from the Division regarding the premium rates being paid by other companies. The Division's response indicated that C & H was classified differently than Yellow Cab and Taxi Service. Kozak was made aware of the apparent misclassification of these and other taxicab companies, as well as the resultant disparity in premium rates. On October 28, 1996, Kozak sent a memorandum to Angela Sheperd, the Division's director of the Office of Employer Accounts, directing investigation and reclassification of a number of taxicab operations and limousine operations, including both Taxi Service and Yellow Cab. C & H also sent a letter to Kozak requesting a meeting to discuss the rate classification of its drivers.

In response to Kozak's memo to Sheperd, Field Auditor Robert C. Skeen conducted an investigation into Yellow Cab's classification. He subsequently prepared a memorandum, dated November 21, 1996, in which he concluded that although Yellow Cab was misclassified as an "automobile/truck rental operation" company, its drivers were independent and should not be considered employees for workers' compensation purposes. (J.A. at 165.)[5]

On April 7, 1997, Burdette wrote a letter to two delegates in the

---

[5]On March 17, 1997, Skeen prepared a second memorandum suggesting that instead of presuming that all drivers leasing their vehicles were employees of the lessees, the Division should adopt the classification method then used by the IRS, including, among other considerations, "20 common law factors." (J.A. at 168-69.) It is not clear whether Skeen's suggestion was intended to be consistent with, or to replace, the "right to control" test adopted by the West Virginia Supreme Court of Appeals in *C & H Taxi Co. v. Richardson*, 461 S.E.2d 442, 448 (W. Va. 1995). The memorandum does not indicate any significant consideration of the precedential effect of the holding in *C & H*.

West Virginia House of Delegates, each of whom had apparently requested information regarding the classification of taxicab companies from Vieweg, indicating that the BEP planned to review the status of each individual taxicab company and draw its own conclusion of the employment relationship for purposes of workers' compensation using the IRS "guide questions." (JA 171.)

On June 13, 1997 and July 1, 1997, C & H wrote to Laura Buchko of the Division's Legal Services Division, requesting information regarding the premium rate for the taxicab industry. C & H also indicated in these letters that it wished to discuss with Buchko the "apparently singular" requirement that C & H pay workers' compensation premiums on its drivers while other companies were not required to do so. (J.A. at 184.) On July 7, 1997, Buchko responded to these letters, indicating that the Office of Employer Accounts (OEA) had not yet completed audits of other companies and that OEA was in the process of establishing an underwriting team that would review the rates paid by other taxicab companies.

In late 1997,[6] C & H sent Kozak a letter informing him that several other taxicab companies were not paying premiums on drivers and were, in C & H's opinion, misclassified; that the "audits" of other taxicab companies referred to in Buchko's letter of July 13, 1997 appeared to have ceased; that C & H had altered its operations in ways that, in its opinion, rendered its drivers independent contractors, rather than employees, for workers' compensation purposes under the IRS "common law" test that C & H understood the Division to have recently adopted; and that C & H felt that the Division was intentionally discriminating against it. This letter was received by Randall B. Suter (Suter), Senior Counsel with the Legal Services Division. In response to an email from Suter requesting information about the C & H situation, Kozak responded that "Randy, Richard Stephenson, Terry Owen, and I worked on the initial lawsuit. Underwriting is supposed to be reviewing all the other taxi employers to get them straightened out. Be prepared for a real UGLY meeting as these folks are really hostile." (J.A. at 583 (emphasis in original).) Burdette also

---

[6]The reproduction of this letter in the joint appendix bears two different dates: November 14, 1997, and December 5, 1997. (J.A. at 546-47.) We conclude that the discrepancy is immaterial.

responded to Suter's request for information, stating that "[C]&[H] is a [West Virginia] [S]upreme [C]ourt decision. [W]hy would we revisit that issue?" (J.A. at 584.) Having received these responses, Suter responded by letter to C & H on December 23, 1997, stating that "[the Division] believes that the employment and classification questions [regarding C & H] have been addressed and resolved by the State Supreme Court in *C & H Taxi v. Richardson*, 194 W. Va. 696, 461 S.E.2d 442 (1995)." (J.A. at 195.) Suter further indicated that any change in the Division's procedures for determining employee/contractor status would be made via a "regulatory change" proposed at a public meeting, and that any information C & H could provide regarding misclassification of other taxicab companies would be appreciated. (J.A. at 194-95.)

Finally, on April 16 and May 22, 1998, C & H wrote to Vieweg, informing him of the misclassification of Yellow Cab and Taxi Service. C & H apparently received no response to these letters. The two other taxicab companies did not begin to pay premiums until July of 1999.

### B.

Eventually having become frustrated with the Division's response to its concerns, on October 30, 1998, C & H filed a complaint alleging seven Counts under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1983 and 1985(3), and Article III, Sections 7 and 10 of the Constitution of West Virginia. These Counts include: 1) a claim against Richardson and Kozak based on their decision to assert coverage over taxicab drivers and their decision to prosecute administrative proceedings against C & H—but not other companies; 2) a claim against all defendants based on application to C & H, but not other companies, of the 1990 regulation; 3) a claim against all Defendants based on discriminatory premium rate classification; 4) a claim against Vieweg and Burdette based on discriminatory application of the 1997 revised standard; 5) a claim against Vieweg for his failure to correct the discriminatory treatment despite actual knowledge; 6) a claim against Burdette for his failure to correct the problem despite actual knowledge; and 7) a claim restating Counts 1-6 as state law claims.[7] C & H alleged that these

---

[7]Although C & H asserted a number of state law grounds for recovery in its complaint, the district court granted summary judgment to Defen-

actions were motivated by the Caperton administration's desire to retaliate for public statements made by Steven J. Corey and Richard G. Corey and for litigating the "employee" issue, and as a bad faith effort to injure C & H.

Defendants filed an answer and, after discovery, a motion for summary judgment. The defendants asserted that: (1) C & H has not established that the decision to assert workers' compensation coverage over cab drivers was causally related to the speech of its owners; (2) bureaucratic inefficiency resulted in the uneven application of the premium rates and coverage; and (3) the defendants could not be sued in their official capacities.

The district court granted summary judgment to the defendants because, under the *McDonnell Douglas*[8] burden-shifting regime, C & H had not rebutted the Defendants' legitimate, non-discriminatory explanation for the unequal treatment—bureaucratic inefficiency. C & H timely appealed.

---

dants without addressing these claims specifically beyond a recitation of their existence in the first paragraph of its Memorandum Opinion and Order. In its opening brief, C & H makes no specific argument concerning its state law claims, confining itself to general arguments that the district court erred in granting summary judgment with respect to all of its claims, and citing only federal-law cases for the applicable legal standards. Accordingly, we consider C & H to have abandoned any argument that its state law claims should have been analyzed under a different legal standard than that applicable to its federal claims. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 241 n.6 (4th Cir. 1999).

[8]The district court applied the burden-shifting scheme applicable under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), to employment discrimination actions. C & H contends that the district court erred in applying this framework. We conclude that the district court's grant of summary judgment to Defendants may be affirmed without reference to *McDonnell Douglas* and accordingly have no occasion to address the applicability of the scheme described therein.

## II.

We exercise jurisdiction pursuant to 28 U.S.C.A. § 1291 (West 1993). We review a district court's grant of summary judgment de novo, *see United States v. Kanasco, Ltd.*, 123 F.3d 209, 210 (4th Cir. 1997), considering the facts and inferences drawn therefrom in the light most favorable to the nonmoving party, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Gillins v. Berkeley Elec. Co-op, Inc.*, 148 F.3d 413, 415 (4th Cir. 1998). The moving party must demonstrate the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Unsupported speculation is not sufficient to defeat a summary judgment motion. *See Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

We face the initial question whether public officials can be liable under the Equal Protection Clause and 42 U.S.C.A. §§ 1983 and 1985(3) for applying a valid law unequally to similarly situated persons. In *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam), the Supreme Court recognized the viability of a "class of one" theory in actions under the Equal Protection Clause, "where the plaintiff alleges that she has been treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* at 564. The plaintiff in *Olech* alleged that the defendant Village's action — a refusal to connect the plaintiff's property to the municipal water supply without the plaintiff's consent to a 33-foot easement — was intentional; that other, similarly situated property owners were required to consent only to 15-foot easements; that the Village's demand for a 33-foot easement was "irrational and wholly arbitrary[;] and that the Village ultimately connected [the plaintiff's] property after receiving a clearly adequate 15-foot easement." *Id.* at 565 (internal quotation marks omitted). "These allegations," the Court concluded, "quite apart from the Village's subjective motivation, are sufficient to state a claim for relief under traditional equal protection analysis." *Id.*

While it is thus clear that the Equal Protection Clause prohibits intentional discrimination even against a "class of one," there remains the question whether § 1983 and § 1985(3) provide a remedy in a case

such as this one. That § 1983 affords such a remedy on appropriate proof is clear — the action brought in *Olech* was itself a claim pursuant to § 1983, *see Olech v. Village of Willowbrook*, 1998 WL 196455 (N.D. Ill. 1998) (district court opinion). That § 1985(3) provides such a remedy, however, is not. To recover under § 1985(3), a plaintiff must establish the existence of a conspiracy and show "some racial or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971); *see also Simmons v. Poe*, 47 F.3d 1370, 1376-77 (4th Cir. 1995) (holding that a plaintiff must prove, *inter alia*, that the conspirators' actions "are motivated by a specific class-based, invidiously discriminatory animus"). C & H does not allege that any racial animus motivated the apparent unequal treatment here, and accordingly it would have to demonstrate some qualifying "otherwise class-based" discrimination. *See, e.g.*, *Bartell v. Lohiser*, 215 F.3d 550, 560 (6th Cir. 2000) ("[Section] 1985(3) only covers conspiracies against: 1) classes who receive heightened protection under the Equal Protection Clause; and 2) 'those individuals who join together as a class for the purpose of asserting certain fundamental rights'") (quoting *Browder v. Tipton*, 630 F.2d 1149, 1150 (6th Cir. 1980)). C & H does not allege that the complained-of discrimination resulted from its membership in any qualifying class. *Cf. United Bhd. of Carpenters, Local 610 v. Scott*, 463 U.S. 825, 837-39 (1983) (holding that § 1985(3) does not reach conspiracies motivated by economic or commercial animus). Accordingly, the district court properly granted summary judgment on C & H's claims under § 1985(3).

Turning to the question whether the district court properly granted summary judgment on C & H's claims under § 1983 and the Equal Protection Clause, we briefly examine the proof required to make out such a claim. Most importantly for our purposes, a plaintiff alleging an Equal Protection violation actionable under § 1983 must establish that the differential treatment it was afforded was intentional, not the result of mere negligence. *See Bryan v. City of Madison, Miss.*, 213 F.3d 267, 277 (5th Cir. 2000); *cf. also County of Sacramento v. Lewis*, 523 U.S. 833, 848-49 (1998) (holding that an allegation of negligence cannot form the basis of a § 1983 claim based on an alleged due process violation); *Veney v. Wyche*, 293 F.3d 726, 730-31 (4th Cir. 2002) (noting that, to succeed on an equal protection claim under § 1983, a plaintiff "'must first demonstrate that he has been treated differently

from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination'" (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). The requisite intent in this context is more than simple awareness of the course of action being taken. As the Supreme Court has explained, "[d]iscriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences." *Personnel Adm'r v. Feeney*, 442 U.S. 256, 279 (1979) (internal quotation marks omitted). Rather, "[i]t implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* C & H has alleged that assessment of fees for workers' compensation coverage of its drivers was a course of action selected by the defendants in retaliation for the exercise of constitutional freedoms by its owners. Thus, we turn to an examination of the evidence presented and forecast by C & H to determine whether its allegations of intentional discrimination are sufficient to survive summary judgment on the record before us. *See* Fed. R. Civ. P. 56(c) (stating that summary judgment shall be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law").

Initially, we assume that C & H was treated differently than Yellow Cab and Taxi Service — two similarly situated companies. Assuming this different treatment, C & H asserts that there are several points on which there is a genuine issue of material fact as to Defendants' intent.

C & H contends that Governor Caperton directed the Division to punish Steven Corey for his public statements by initiating that 1990 regulation and asserting that C & H's drivers are employees rather than independent contractors, and therefore covered by workers' compensation premium requirements. A primary basis for C & H's contention that the Division's actions constituted retaliation is the timing of those actions relative to the dispute between Corey and the Caperton administration and the related litigation instituted by Corey.

First, C & H argues that the 1990 Notice is closely linked in time with the intensification of the dispute between Corey and the Caper-

ton administration. While timing may be relevant, it is not always sufficient to create a triable issue of fact on the issue of intent. *See, e.g.*, *Zahra v. Town of Southold*, 48 F.3d 674, 684 (2d Cir. 1995) (concluding that timing was insufficient to establish motive in a selective enforcement case). Here, the events closely linked in time are the dispute between Corey and the Caperton administration and the Division's announcement of a new standard applicable to *all* taxicab companies. The new rule announced in the 1990 Notice was not an action specific to C & H, but rather an across-the-board change to be applied equally to all such companies. Only several years later was this new rule ultimately applied to require C & H to pay workers' compensation premiums on its drivers. Moreover, Defendants offered undisputed evidence that the process resulting in the 1990 notice was instituted before the controversy surrounding the festival contract began. (J.A. at 88-90.) Finally, none of the named defendants was involved in the policy decision announced in the 1990 Notice. (J.A. at 115.) Accordingly, the timing of the 1990 Notice is insufficient to create a triable issue of fact regarding any Defendant's intent to discriminate against C & H.

C & H further contends that the 1990 regulation was instituted in retaliation for C & H's filing suit regarding its festival contract dispute with the Caperton administration. Whereas the 1990 regulation decision was made in April 1990 after an internal investigation begun in 1988 or 1989, however, the public dispute regarding the contract intensified in May 1990, and a suit was filed by Incorsel on June 15, 1990. (JA 22-23.) Thus, C & H's timing argument regarding the linkage between the 1990 Notice and Corey's initiation of litigation is fatally flawed, and cannot establish the existence of a genuine issue of material fact.

In addition to its timing arguments, C & H also contends that the actions of the Division in not applying the 1990 regulation even-handedly, in not fixing the premium misclassification, and not applying the new (IRS) standard apparently adopted by the Division in 1997 to determine drivers' independent contractor status constituted a deliberate, bad faith attempt to injure it by discriminating against it. There is a strong presumption that state actors properly discharge their duties. *See United States v. Mezzanatto*, 513 U.S. 196, 210 (1995). Nonetheless, we address C & H's several arguments regard-

ing the pieces of evidence it alleges establish the requisite intent to support its claim.

First, C & H points to Richardson's advice to Marlowe during their meeting on June 26, 1991. C & H asserts that Richardson's advice to "do nothing" constituted a suggestion regarding how to avoid paying workers' compensation premiums. Such an inference, however, is not reasonable under the circumstances. At the time of Richardson's meeting with Marlowe, C & H's challenge to application of the 1990 regulation was pending in West Virginia state court. Further, Taxi Service's similar challenge had been continued pending resolution of C & H's case. As of June, 1991, none of the taxicab companies we have discussed, including C & H, were paying workers' compensation premiums on their drivers; C & H did not begin paying such premiums until four years later, after the decision of the Supreme Court of Appeals of West Virginia. Under the circumstances, then, Richardson's advice to "do nothing" for the time being with respect to workers' compensation premiums cannot reasonably be interpreted as C & H would have us interpret it — as an indication that Taxi Service could forever avoid paying workers' compensation premiums simply by lying low. Rather, Richardson's statement simply reflects the undisputed fact that the applicability of the 1990 regulation was uncertain as of the time of the meeting.[9]

Second, C & H points to a 1997 email it states evinces hostility by Kozak toward C & H. This email states in reference to a prospective meeting, "Be prepared for a real UGLY meeting as these folks are really hostile." (emphasis in original). This email is not probative of the Division's or Kozak's intent against C & H; it merely is an observation from Kozak's perspective regarding C & H's attitude. *Cf. LeClair v. Saunders*, 627 F.2d 606, 611 (2d Cir. 1980) (holding that evidence that inspector was angry with another farmer visited immediately before plaintiff did not prove malice toward plaintiffs). Addi-

---

[9]In a similar vein, C & H points out that Stephenson cancelled, in 1991, a study he had ordered to determine how Taxi Service's drivers should be classified. As with C & H's allegations regarding the meeting between Richardson and Marlowe, we cannot conclude that this action reflects anything more than the uncertain status of the 1990 regulation during 1991.

tionally, C & H points to the fact that handwritten notes by Burdette equate C & H with "Corey." Because Burdette was aware of Richard Corey's statements critical of the Division, C & H contends that equating the two allows an inference of discriminatory intent. We conclude, however, that this inference is too speculative to permit an inference of intent to discriminate against C & H.

Third, C & H contends that despite having continued the Taxi Service and Yellow Cab matters until resolution of C & H's case and receiving repeated, actual notice about the disparity of treatment regarding the application of the 1990 regulation, the premium misclassifications, and a request for application of the 1997 revised standard, the Division intentionally did not address these disparities. The Division has asserted that bureaucratic inefficiency caused the disparity. More importantly, however, C & H has not proffered any evidence that would establish the specific intent of any defendant. *See Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 17 (2d Cir. 1999) (holding that plaintiff could not withstand motion for summary judgment because proof of malice rested on "conjecture and speculation"); *LaTrieste Rest. & Cabaret Inc. v. Village of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994) (overturning grant of summary judgment when evidence was presented that police chief stated "I do not want a topless club in my town" and mayor participated in picketing demonstrations); *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1353 (2d Cir. 1994) (overturning district court dismissal in selective enforcement claim because evidence that officials planned to damage plaintiff through selective "white glove" inspections was produced). C & H's speculative interpretation of the Division's inaction, without more, is insufficient to permit an inference of intent. Indeed, Richard Corey admitted that he had no knowledge, information, or documents indicating that Governor Caperton directed anyone to take action against C & H.

As the record now stands, the evidence presented and inferences drawn from it support negligent conduct caused by ill-managed government, but not the requisite discriminatory intent. For a jury to adopt C & H's claim of discriminatory intent, it would have to engage in sheer speculation and conjecture. Because C & H has not presented evidence from which non-speculative inference of intent can be drawn, we affirm the decision of the district court granting summary

judgment on all counts to the defendants. *See Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (4th Cir. 1958) (stating that "[P]ermissible inferences must still be within the range of probability . . . and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that its rests merely upon speculation and conjecture").

## III.

Because C & H has not presented evidence of discriminatory intent, the district court did not err in granting summary judgment on all counts to defendants. Accordingly, we affirm the judgment of the district court.

*AFFIRMED*