# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

## UNITED STATES

**v.**

## Staff Sergeant NICHOLAS R. CRON
## United States Air Force

## ACM 38138

## 27 June 2014

## _____ M.J. _____

Sentence adjudged 9 February 2012 by GCM convened at Kadena Air Base, Okinawa, Japan. Military Judge: Vance H. Spath (sitting alone).

Approved Sentence: Dishonorable discharge, confinement for life without the possibility of parole, forfeiture of all pay and allowances, and reduction to E-1.

Appellate Counsel for the Appellant: Major Nicholas D. Carter (argued) and Colonel Patrick J. Wells.

Appellate Counsel for the United States: Captain Matthew J. Neil (argued); Colonel Don M. Christensen; Lieutenant Colonel C. Taylor Smith; and Gerald R. Bruce, Esquire.

Before

ROAN, MARKSTEINER, and MITCHELL
Appellate Military Judges

OPINION OF THE COURT

This opinion is subject to editorial correction before final publication.

MITCHELL, Judge:

A general court-martial composed of a military judge convicted the appellant, pursuant to his pleas, of conspiracy to commit premeditated murder, premeditated murder, and wrongfully impeding an investigation, in violation of Articles 81, 118, and 134, UCMJ, 10 U.S.C. § 881, 918, 934. The adjudged and approved sentence consisted

of a dishonorable discharge, confinement for life without the possibility of parole, forfeiture of all pay and allowances, and reduction to E-1.

On appeal,[1] the appellant avers: (1) the military judge should have recused himself due to his friendship with lead trial counsel; (2) trial defense counsel provided ineffective assistance of counsel by not conducting a sufficient voir dire of the military judge regarding his relationship with the lead trial counsel; (3) the military judge erred by allowing a prosecution exhibit to be displayed during the trial; (4) the sentence to confinement for life without the possibility of parole is inappropriately severe; (5) trial counsel committed prejudicial misconduct during sentencing argument; and (6) the pretrial agreement (PTA) violated public policy. Finding no error materially prejudicial to the appellant, we affirm the findings and sentence.

*Background*

The appellant was a 30-year-old Staff Sergeant (SSgt) stationed at his fourth duty station, Kadena Air Base, Okinawa, Japan. The victim, Technical Sergeant (TSgt) Curtis Eccleston, was a member of the same squadron as the appellant, and they knew each other from work.

In late 2008, the appellant met a woman named Barbara Keiko Nakandakari on a social networking site. They eventually met in person and began a sexual relationship.

Ms. Nakandakari later met the victim, TSgt Eccleston, married him in April 2010 and took his last name. Shortly thereafter, the victim completed paperwork to name her as the beneficiary of his $100,000 death gratuity benefit and his $400,000 Servicemembers Group Life Insurance policy.

The appellant continued his sexual relationship with the now-married Ms. Barbara Eccleston, while she was married to the victim. As the appellant and the victim worked opposite schedules, the appellant spent nearly every day with Ms. Eccleston while her husband was at work. In early November 2010, TSgt Eccleston decided to divorce his wife.

In the fall of 2010, the appellant and Ms. Eccleston agreed to murder TSgt Eccleston, developing three plans. They referred to one as "plan A" or "the steps plan." This plot involved the appellant stringing fishing line at the top of the stairs outside of TSgt Eccleston's apartment, the appellant staging himself at the bottom of the steps, and the victim's wife faking an allergic reaction with her medication in the car. The idea was that the victim, in an effort to assist his wife, would trip over the fishing

---

[1] We held oral argument in this case at Georgetown University Law Center, Washington, D.C., as part of the Court's "Project Outreach." *See United States v. Mahoney*, 58 M.J. 346, 347 n.1 (C.A.A.F. 2003).

line and fall down the stairs. If the victim did not die from the fall, the appellant was prepared to break his neck. After this plan was formed, the appellant kept fishing line in his car. The "backup" plan was to invent a story about TSgt Eccleston being involved with local drug dealers. The co-conspirators planned to make it appear the victim was murdered after a dispute with these fictional local drug dealers.

At one time, the appellant and Ms. Eccleston exchanged text messages about killing TSgt Eccleston. The appellant was at work when he received a text message from Ms. Eccleston asking him, "Do you love me?" He replied, "Yes." She followed up, "Can you prove it?" He answered, "Yes." She then asked, "Will you kill him for me?"

Around the end of January 2011, the victim received formal notification of a permanent change of station (PCS) to Scott Air Force Base, Illinois, with a report no later than date of 20 July 2011. He planned to complete the divorce proceedings prior to his PCS.

On 26 January 2011, the appellant heard that the victim was telling people at work that his divorce from Ms. Eccleston would be final within the week. The appellant relayed this information to her, and she replied that it was not true. He responded to her with a text message, "[I]t don't [sic] really matter anyways! We know the outcome!"

The appellant and Ms. Eccleston decided the appellant would murder the victim that following weekend using the "drug dealer plan." Although Ms. Eccleston was moving into another apartment, she still had access to her husband's apartment. On 3 February 2011, the appellant picked her up from her husband's apartment while he was at work. Ms. Eccleston left a window unlocked so the appellant could enter at a later time. On the afternoon of 5 February 2011, the appellant became concerned that if he entered through the window, a bed located underneath it would make too much noise when he stepped on it. They both went back to the apartment. The appellant waited outside while she checked to see how much noise the bed would make. The plan was for the appellant to enter the apartment through the window while the victim was playing computer games late at night. He knew the victim usually wore headphones and would be at his desk with his back to the hallway. The appellant planned to enter through the window, creep up on the victim, and slit his throat.

On 5 February 2011, the appellant left work at about 2100, drove home, and packed a backpack with his supplies for the murder. He packed surgical gloves, dishwashing gloves, white hand towels, a hunting knife, a box cutter, and clothes. He then had dinner with Ms. Eccleston and another friend. He left the dinner claiming he needed to study for an upcoming test; however, he actually drove to a dirt parking lot about a mile from the victim's house. There he changed into black pants, a black sweatshirt, running shoes, and a black stocking cap. He then took his backpack and walked to the victim's apartment.

When he arrived at the apartment, all the lights were off. The appellant was concerned the victim was not playing video games, so he called Ms. Eccleston to discuss what to do next. The appellant then returned to his car to wait for the victim to fall into a heavy sleep. The appellant passed the time by taking a nap. He slept until about 0300 and then called Ms. Eccleston again. Not wanting to walk the distance again, the appellant drove his car closer to the victim's apartment. He left his car and went to the apartment where he saw the flicker of light from a television. He called Ms. Eccleston again, but she assured him that her husband often slept with the television on.

The appellant returned to the apartment at about 0400. He put on the dishwashing gloves and opened the blade on the hunting knife. After entering the apartment, he cut and stabbed the victim multiple times. The victim pleaded with the appellant to leave several times and promised not to tell anyone. The appellant refused. While fighting for his life and trying to defend himself, the victim suffered multiple wounds to his hands, knees, feet, head, and neck. A deep cut to his left ring finger nearly severed the tip. He suffered three cutting wounds and one stabbing wound to the front of the neck. A cutting wound to the neck tore a hole in the victim's windpipe. At 0447, the appellant made a second phone call to Ms. Eccleston that lasted 6 minutes and 31 seconds. During that phone call, he placed the phone on a speaker setting and put it on the kitchen table. Before hanging up, and while the victim was lying on the kitchen floor, the appellant inflicted a cutting wound to the side of the victim's neck. He then made a final stabbing wound with the hunting knife that severed the victim's carotid artery. After removing two cans of soda from the refrigerator, he left one open on the table so it would look like someone had been drinking it. He drank the other can of soda while he was still in the victim's apartment. As he left the apartment, he took the victim's laptop and phone. He called Ms. Eccleston again, and she asked him if the victim was dead yet. He replied, "No, but he only has minutes."

The appellant walked to his car and changed clothes. As he drove home, he tossed out the backpack, clothes, and the victim's cellphone and laptop.

The next morning a co-worker called the appellant and told him the victim was found dead in his apartment. The appellant called Ms. Eccleston to inform her of the situation. He then deleted all of his phone call history logs and several text messages that had been exchanged between the two of them. Later, the appellant was asked to report to the crime scene, as a co-worker knew he was friends with Ms. Eccleston, and she could not be located.

The appellant arrived at the crime scene and made sworn statements to the investigators. He told them he had seen Ms. Eccleston the night before, but falsely stated that he went home at 0030. He lied to the investigators by telling them Ms. Eccleston had discovered a lot of money and several small packets and bottles of an unknown

substance in the victim's apartment. On 7 and 8 February 2011, the appellant had follow-up interviews with the investigators and repeated the above false statements to them.

On 12 and 14 February 2011, the appellant confessed to investigators from the Air Force Office of Special Investigations (AFOSI) that he conspired with Ms. Eccleston to murder TSgt Eccleston, that he committed the murder, and that he lied to investigators in order to misdirect the investigation.

Charges were preferred against the appellant on 24 March 2011. The charges were investigated at an Article 32, UCMJ, 10 U.S.C. § 832, hearing. The Article 32, UCMJ, investigating officer recommended the charges be referred, but not as a capital case. On 3 November 2011, the convening authority referred the charges to a general court-martial as a capital case.

Prior to preferral, the appellant submitted a PTA offer on 3 March 2011. The appellant offered, inter alia, to plead guilty to all charges and specifications, waive his right to a trial by members, not request to have the Government travel sentencing witnesses on his behalf, waive all waivable motions, and "answer any questions posed to me by Japanese investigators or public prosecutors pertaining to Barbara Keiko Eccleston's involvement in the potential charges [he] was facing." In exchange, the appellant sought to have the case referred as non-capital and confinement capped at life with the possibility of parole. This offer was rejected.

The appellant submitted a second PTA offer on 22 August 2011. In this second offer, the appellant offered, inter alia, to plead guilty to all charges and specifications, to waive his right to an Article 32, UCMJ, investigation, to waive all waivable motions, to waive the continued appointment and funding of all previously appointed experts except for the mitigation specialist and forensic psychologist, and "to waive all foundational objections to Prosecution sentencing exhibits." In exchange, the appellant sought to have the case referred as non-capital. This offer was also rejected.

A third PTA was signed on 8 November 2011. This PTA converted the capital referral to a non-capital case. There was no other sentence limitation. This PTA was accepted. Pursuant to the PTA, the appellant pled guilty to all charges and specifications at a general court-martial before a military judge sitting alone. This third PTA is discussed in greater detail below as the appellant now challenges its terms.

*Conflict of Interest Based on Friendship of Military Judge and Senior Trial Counsel*

The military judge was Colonel (Col) Vance Spath. An Article 39(a), UCMJ, 10 U.S.C. § 839(a), session was held on 28 November 2011. When the court-martial reconvened on 30 January 2012, Col Don Christensen had detailed himself as trial counsel.

The military judge previously served as trial counsel in *United States v. Witt*, 72 M.J. 727, 742 (A.F. Ct. Crim. App. 2013) (petition for reconsideration granted), an unrelated court-martial for murder tried in October 2005. At the time of the appellant's court-martial, the *Witt* case was being litigated at the appellate level before this Court. One of the appellant's trial defense counsel, Major (Maj) NM, was also one of the appellate defense counsel in the *Witt* case. The assignment of error in *Witt* included allegations that trial counsel committed plain error. At trial in the present case, Maj NM indicated that trial defense counsel considered a motion to have Col Spath recused due to the previous interaction between Col Spath and Maj NM on the *Witt* case. When trial defense counsel later indicated they were waiving the recusal motion, the military judge explicitly stated that this is a non-waivable motion and that the appellant had "a right to an impartial judge." He then asked trial defense counsel if they had any concerns about his impartiality to which they responded, "No concerns, Your Honor."

The military judge sua sponte informed counsel that he had known Col Christensen since 1994. He stated, "I would certainly call him a friend, I think." However, he also stated they had never been to each other's houses, they had never been stationed together despite having had similar jobs, and they had never rated each other. He also stated they had never spent any time alone together or emailed each other privately. He stated they had been out in group settings and had e-mail exchanges as part of a group. He characterized their relationship as "like Air Force friends we see each other when we are TDY together, and we don't see each other when we are not." The military judge also explained that he had previously recused himself when close friends appeared in front of him, but that he did not view this relationship in the same way. Neither trial counsel nor defense counsel had any additional questions nor did they challenge him. The appellant then affirmatively declared that he elected to proceed to trial with the military judge alone. The appellant likewise did not raise any questions or concerns on this issue at trial.

Along with being trial counsel in the present case, Col Christensen was also the Chief of the Government Trial and Appellate Counsel Division (AFLOA/JAJG)—a position he continues to hold. In this position, he "supervises all Air Force appeals before [this Court], the U.S. Court of Appeals for the Armed Forces (USCAAF), and the U.S. Supreme Court." Air Force Manual 51-204, *United States Air Force Judiciary and Air Force Trial Judiciary*, ¶ 1.4 (18 January 2008). The appellant argues that, as the AFLOA/JAJG Chief, Col Christensen therefore defends the decisions of military judges and trial counsel. The appellant further argues that, in this specific case, Col Christensen was defending the actions of Col Spath as trial counsel in the *Witt* case as well as

6                                                                                          ACM 38138

defending his decisions as a military judge in other cases, creating an unwaivable conflict of interest.[2]

On appeal, the appellant now avers the military judge should have sua sponte recused himself and that his trial defense counsel were ineffective for not conducting additional voir dire of the military judge and trial counsel.

### a. Disqualification of Military Judge

"An accused has a constitutional right to an impartial judge." *United States v. Butcher*, 56 M.J. 87, 90 (C.A.A.F. 2001) (citations and internal quotation marks omitted). "[A] military judge shall disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned." Rule for Courts-Martial (R.C.M.) 902(a). "[T]he test is whether, taken as a whole in the context of this trial, a court-martial's legality, fairness, and impartiality were put into doubt by the military judge's actions." *United States v. Burton*, 52 M.J. 223, 226 (C.A.A.F. 2000) (citations and internal quotation marks omitted). When conducting this test, we apply an objective standard of "any conduct that would lead a reasonable man knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned." *United States v. Kincheloe*, 14 M.J. 40, 50 (C.M.A. 1982) (citations and internal quotation marks omitted). When the issue of disqualification is raised for the first time on appeal, we apply the plain error standard of review. *United States v. Martinez*, 70 M.J. 154, 157 (C.A.A.F. 2011) (citing *United States v. Jones*, 55 M.J. 317, 320 (C.A.A.F. 2001)). "Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice." *Id.* (citing *United States v. Maynard*, 66 M.J. 242, 244 (C.A.A.F. 2008)).

Our superior court "has emphasized that the appearance standard does not require judges to live in an environment sealed off from the outside world." *Butcher*, 56 M.J. at 91. The court explained:

> The interplay of social and professional relationships in the armed forces poses particular challenges for the military judiciary. Both before and after service in the judiciary, a judge advocate typically will serve in a variety of assignments as a staff attorney and supervisor. Such assignments normally include duties both within and outside the field of criminal law. In the course of such assignments, the officer is likely to develop numerous friendships as well as patterns of social activity. These relationships are nurtured by the military's emphasis on a shared mission and unit cohesion, as well as traditions and customs concerning personal, social, and

---

[2] The appellant does not offer any evidence of any particular cases where the Government Trial and Appellate Counsel Division, and specifically Colonel (Col) Christenson, was defending the decision of Col Spath as a military judge.

professional relationships that transcend normal duty hours. When assigned to the judiciary, the military judge frequently will find himself or herself in close and continuing contact with judge advocates outside the courtroom. It is not unusual for judges and counsel to be invited to the same professional and social functions. . . . In light of these circumstances, members of the military judiciary must be particularly sensitive to applicable standards of judicial conduct.

*Id.*

Here we find no error in the military judge continuing to serve even though he had an "Air Force friendship" with one of the trial counsel. A military judge is not disqualified solely "on the basis of personal acquaintanceship or a professional friendship that is shared with other members of the bar." *United States v. Berman*, 28 M.J. 615, 619 (A.F.C.M.R. 1989) (citing *Selfridge v. Gynecol, Inc.*, 564 F. Supp. 57 (D.C. Mass. 1983)). The evidence of the relationship was of a "professional friendship" between two Air Force Judge Advocate officers of the same rank with similar career progression.

The record is clear that the military judge conducted this proceeding in a fair, orderly, and judicious manner. The military judge was steadfast in ensuring the appellant and his trial defense counsel understood the terms of the PTA that they voluntarily chose to enter into with the convening authority. For example, the military judge recommended that trial defense counsel keep a log of all the objections they reasonably would have made but for the PTA provision that required the waiver of certain evidentiary objections.

Finding no error in the military judge's professional friendship with trial counsel, we turn to whether the professional interaction of the military judge and trial counsel in the appellate process of other cases serves as a basis for recusal. We determine it does not. "There is a strong presumption that a judge is impartial, and a party seeking to demonstrate bias must overcome a high hurdle, particularly when the alleged bias involves actions taken in conjunction with judicial proceedings." *United States v. Quintanilla*, 56 M.J. 37, 44 (C.A.A.F. 2001). Although the appellant characterizes Col Christensen's duty as defending the actions of military judges and trial counsel, these individuals are not his client; the United States is. In some cases that may mean arguing that the military judge or trial counsel were correct or that any mistakes were harmless. Likewise, in claims of ineffective assistance of counsel, appellate government counsel is likely to "defend" the actions of the trial defense counsel. In other cases, his duties to his client may require him to challenge an order or ruling of a military judge. *See* Article 62, UCMJ, 10 U.S.C. § 862. We find no per se prohibition on appellate government counsel performing the duties of trial counsel. We find no per se rule that a military judge, who, from prior assignments, has had cases he worked on as trial counsel, defense counsel, or as a military judge, must recuse himself from every case where appellate counsel is now serving as trial counsel. We find no error, let alone plain error, on this issue.

*b. Trial Defense Counsel Duty to Voir Dire Military Judge and Senior Trial Counsel*

The appellant recasts the above argument as an ineffective assistance of counsel claim, alleging trial defense counsel should have conducted a more thorough voir dire of the military judge and trial counsel regarding their professional friendship.

This Court reviews claims of ineffective assistance of counsel de novo. *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009). When reviewing such claims, we follow the two-part test outlined in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under *Strickland*, the appellant has the burden of demonstrating: (1) a deficiency in counsel's performance that is "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;"[3] and (2) that the deficient performance prejudiced the defense through errors "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." 466 U.S. at 687.

The deficiency prong requires the appellant to show his defense counsel's performance "fell below an objective standard of reasonableness," according to the prevailing standards of the profession. *Id.* at 687-88. The prejudice prong requires the appellant to show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In doing so, the appellant "must surmount a very high hurdle." *United States v. Perez*, 64 M.J. 239, 243 (C.A.A.F. 2006) (citations and internal quotation marks omitted). This is because counsel is presumed competent in the performance of their representational duties. *United States v. Anderson*, 55 M.J. 198, 201 (C.A.A.F. 2001). Thus, judicial scrutiny of defense counsel's performance must be "highly deferential and should not be colored by the distorting effects of hindsight." *United States v. Alves*, 53 M.J. 286, 289 (C.A.A.F. 2000) (citing *United States v. Moulton*, 47 M.J. 227, 229 (C.A.A.F. 1997)).

To determine whether the presumption of competence has been overcome, our superior court has set forth a three-part test:

1. Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?

2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?

3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

---

[3] U.S. CONST. amend. VI.

*United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)) (alteration and omission in original).

"[T]he defense bears the burden of establishing the truth of the factual allegations that would provide the basis for finding deficient performance." *United States v. Tippit*, 65 M.J. 69, 76 (C.A.A.F. 2007). When there is a factual dispute, appellate courts determine whether further fact-finding is required under *United States v. Ginn*, 47 M.J. 236 (C.A.A.F. 1997). If, however, the facts alleged by the defense would not result in relief under *Strickland*, the Court may address the claim without the necessity of resolving the factual dispute. *See Ginn*, 47 M.J. at 248.

The three trial defense counsel each submitted an affidavit on this issue pursuant to this Court's order. Captain KR explained their decision to not challenge this military judge:

> Colonel Spath was the trial counsel in US. v. Witt, a case with arguably even more egregious facts than [the appellant's]. Colonel Spath, as someone who had prosecuted and defended a murder case, was uniquely qualified among Air Force judges to hear [the appellant's] case and to keep the facts of the case in proper perspective.

Maj DS had previously litigated courts-martial before Col Spath and Col (then Judge) Christensen. He was "very familiar with Judge Spath's demeanor, judicial temperament, and his history as a judge, a prosecutor, and as a defense attorney." Furthermore, Maj DS had previously attended numerous trial advocacy conferences that included social events with both Col Spath and Col Christensen. He had seen their interactions and never observed anything other than two professional colleagues. He also believed that based on Col Spath's prior experience, it was in his client's best interest to have him as the military judge. Maj NM was not as familiar with Col Spath but discussed his demeanor and experience with his co-counsel. Maj NM had known Col Christensen since 2008 when he was an area defense counsel who appeared before then-Judge Christensen in several trials. His opinion was that Col Christensen is "one of the finest officers I've ever served with" and had the utmost integrity. Maj NM did not see a need to voir dire the military judge to address potential appearance issues, as his only duty was to his client, and he believed it was in his client's best interest not to voir dire the military judge.

"'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 690-91) (alteration in original). Here, we find trial defense counsel made a reasonable strategic choice based on a sufficiently thorough investigation of the facts known to them, both as disclosed by the military judge on the record at trial and by their outside knowledge of the trial counsel and military judge.

*Pretrial Agreement Provisions*

The appellant challenges the accepted PTA as creating an "empty ritual" rather than a full sentencing proceeding. The appellant did not raise any objections to the terms of the PTA at trial. PTAs are governed by R.C.M. 705(c), which identifies prohibited and permissible terms and conditions. A PTA creates a constitutional contract between the accused and the convening authority wherein the accused agrees to waive constitutional rights in exchange for a benefit. *United States v. Smead*, 68 M.J. 44, 59 (C.A.A.F. 2009). However, due process concerns outweigh the contract principles as "the government is bound to keep its constitutional promises." *Id.* (citations and internal quotation marks omitted). To that end, a provision that denies the accused a fair hearing or otherwise "substitutes the agreement for the trial, [thereby] render[ing it] an empty ritual" violates public policy. *United States v. Holland*, 1 M.J. 58, 60 (C.M.A. 1975). *See also Ricketts v. Adamson*, 483 U.S. 1, 10 (1987). "It is the military judge's responsibility to police the terms of pretrial agreements to insure compliance with statutory and decisional law as well as adherence to basic notions of fundamental fairness." *United States v. Riley*, 72 M.J. 115, 120 (C.A.A.F. 2013) (citations and internal quotation marks omitted). "To ensure that the record reflects the accused understands the pretrial agreement and that both the Government and the accused agree to its terms, the military judge must ascertain the understanding of each party during the inquiry into the providence of the plea." *United States v. Smith*, 56 M.J. 271, 272-73 (C.A.A.F. 2002). "The interpretation of a pretrial agreement is a question of law, which is reviewed under a de novo standard." *United States v. Acevedo*, 50 M.J. 169, 172 (C.A.A.F. 1999).

The appellant argues that the potential for the death penalty in this case caused a coercive environment during the PTA negotiations. In essence, the appellant argues that the possibility of receiving the death penalty was so overwhelming that any agreement which removed the onus of death was not voluntary but was coerced. We disagree.

An appellant is not prohibited from entering into a PTA merely because he fears receiving the death penalty and is able to avert that possibility. *See Brady v. United States*, 397 U.S. 742, 748 (1970). In fact, an accused who is represented by competent counsel may make a voluntary and intelligent choice to plead guilty solely to avoid the death penalty. *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). Our superior court "is well aware of the dangers of coercion and overreaching in the area of pretrial agreements. [They] also realize, however, that restrictions on pretrial agreements can work to the detriment of an accused." *United States v. Rivera*, 46 M.J. 52, 54 (C.A.A.F. 1997). "A defendant can 'maximize' what he has to 'sell' only if he is permitted to offer what the prosecutor is most interested in buying." *United States v. Mezzanatto*, 513 U.S. 196, 208 (1995). Our superior court adopted the reasoning of the Supreme Court that "[t]he mere potential for abuse of prosecutorial bargaining power is an insufficient basis for foreclosing negotiation altogether. . . . Instead, the appropriate

response to respondent's predictions of abuse is to permit case-by-case inquiries into whether waiver agreements are the product of fraud or coercion." *Rivera*, 46 M.J. at 54-55 (quoting *Mezzanatto*, 513 U.S. at 210) (omission in the original). PTAs have been upheld in other cases where an appellant was confronted with a capital referral. *See United States v. Thomas*, 60 M.J. 521 (N.M. Ct. Crim. App. 2004). We expressly hold that an appellant who faces a possible capital referral is permitted to bargain with the Government in order to avoid the death penalty.

The military judge questioned the appellant at length regarding the entire PTA and specifically the provisions about which the appellant now complains. For each provision, the appellant told the military judge he understood its terms, and he had no concerns. The appellant stated he entered the PTA voluntarily and that no one made any attempt to force or coerce him into making the offer to plead guilty. He also stated his plea of guilty was voluntary and of his own free will. The military judge made a specific finding that the PTA was entered into voluntarily. We concur. We find no evidence in the record that the appellant was coerced or that any part of the PTA was the product of fraud.

### a. Waiver of Certain Objections Under Mil. R. Evid. 800, 900, and 1000 Series

The PTA contained a provision requiring the appellant to "[w]aive [his] right to make any evidentiary objections under the M.R.E. 800 series, M.R.E. 900 series, or M.R.E 1000 series during any portion of the proceedings." As part of the inquiry regarding the PTA, the military judge explained that the provision stated the appellant agreed to waive any objections under hearsay (Mil. R. Evid. 800 series), authentication and identification (Mil. R. Evid. 900 series), and contents of writings, recordings, and photographs (Mil. R. Evid. 1000 series). The military judge asked trial defense counsel to keep a log of objections they would have made but for this provision. Trial defense counsel asked if they could note the "but-for" objections as the trial proceeded, instead, to which the military judge agreed. He explained that this would enable him to see how the provision actually applied in the case and be able to ask the appellant about the provision and the effect of the waiver at the conclusion of the trial. This would allow him to "ensure that the provision worked out the way that both parties thought it would."

After both sides had rested and presented their arguments, the military judge conducted a lengthy inquiry with the appellant regarding the effect of the waiver provision. The military judge discussed specific prosecution exhibits where trial defense counsel had noted their "but-for" objections. These included hearsay and evidentiary objections concerning exhibits of Facebook messages and e-mails between the victim and his friends, recordings of telephone calls the appellant made while in pretrial confinement, Facebook postings on the victim's dedication page, impact statements from friends and family members of the victim, and hearsay statements admitted through the

testimony of a witness.[4]  For each of these subject areas, the military judge explained the defense objection to the appellant, his likely ruling, and what trial counsel would have been required to do to overcome the objection.  The appellant stated he understood after each explanation.  The military judge summarized, "So far as I see that is how that specific provision impacted your case.  There were a variety of objections that could have been made, likely they would have been resolved by either the testimony of live witnesses or they would have been overruled, and those are the only objections we had."  The appellant stated he understood how the provision applied in his case, he was able to put on a complete sentencing case, and he voluntarily entered into that provision.  Trial defense counsel agreed they were able to put on a "full or complete" sentencing case.

"[W]aiver of evidentiary objections is a permissible term of a pretrial agreement." *Rivera*, 46 M.J. at 54 (citing *United States v. Gibson*, 29 M.J. 379 (C.M.A. 1990)).  In *Gibson*, our superior court upheld a provision which required the appellant to waive "all evidentiary objections based on the Military Rules of Evidence to any pretrial statements made by [his] children."  29 M.J. at 380.  Notably, this provision applied to even the contested findings portion of the trial.  Under the facts of this case, we conclude that the term to waive specific evidentiary objections based on hearsay, authentication, and "the best evidence" rule is a permissible term in a PTA.

In the offer he submitted on 22 August 2011, the appellant offered "to waive all foundational objections to Prosecution sentencing exhibits."  This offer was rejected by the convening authority.  As the military judge noted at trial, if trial defense counsel had raised a hearsay objection to the victim impact statements, trial counsel may have called the witnesses to testify in person.  In "the current case, we can well see why a defendant might prefer to have a 'cold' reading of a witness's statement rather than the physical presence" of friends and family members who suffered social, psychological, and other impacts from the appellant's murder of the victim.  *United States v. Vasquez*, 72 M.J. 13, 21 n.6 (C.A.A.F. 2013).  Our superior court has held that a provision that is initiated by the defense will be upheld, even though the same provision would violate public policy if initiated or required by the Government.  "To hold otherwise would deprive appellant of the benefit of his bargain."  *United States v. Weasler*, 43 M.J. 15, 19 (C.A.A.F. 1995) (waiver of unlawful command influence motion valid because proposed by the appellant).  We likewise would not deprive the appellant of the benefit of his bargain.

### b.  Statements to Civilian Investigators

In the PTA submitted by the appellant on 3 March 2011, he offered "[t]o testify as a witness in the trial of Barbara Keiko Eccleston" and "[t]o answer any questions posed to [him] by Japanese investigators or public prosecutors pertaining to Barbara Keiko

---

[4]  The military judge also noted he had sustained a defense objection under Mil. R. Evid. 403 to one prosecution exhibit.

Ecccleston's involvement in the potential charges [he was] currently facing." The appellant argues that a similar paragraph in the approved PTA violates public policy as it required him to testify and answer questions by Japanese investigators "without the presence of [his] defense counsel."[5] Again, as the appellant was the one who originated a similar provision, we are not inclined to deprive the appellant of the benefit of his bargain. *Id.*

"A promise to testify as a witness in the trial of another person" is a permissible term of a PTA. R.C.M. 705(c)(2)(B); *See also United States v. Tate*, 64 M.J. 269 (C.A.A.F. 2007). At the time of trial, trial defense counsel indicated that the appellant had already complied with this provision and would continue to do so. The only unusual part of this provision was that the appellant would cooperate without the presence of counsel. We need not decide the exact outer limits of waiver of the appellant's right to counsel in statements or court proceedings against a co-conspirator being prosecuted in a foreign country's jurisdiction as this issue is not ripe before us. "[A]ny issue involving [the] appellant's right against self-incrimination arising from coerced testimony would not be ripe until the Government attempted to use such testimony against him in a criminal proceeding." *Rivera*, 46 M.J. at 54. While the record contains statements the appellant made to the Japanese police in February 2011, it does not contain any statements made by the appellant pursuant to this provision to cooperate in the investigation and prosecution of his co-conspirator.

### c. Waiver of Additional Funding for Expert Consultants

In the PTA submitted on 22 August 2011, the appellant offered "[t]o waive the continued appointment and funding of [his] previously approved expert consultants" with the exception of the defense mitigation specialist and the defense forensic psychologist. The appellant now claims a similar provision in his approved PTA[6] violates public policy as it resulted in an empty ritual.

---

[5] The term of the approved pretrial agreement (PTA):

> [I]agree to tell the full truth, testify, and fully cooperate in all interviews requested by Japanese prosecutors in Barbara Eccleston's criminal case without the presence of my defense counsel. I further agree to tell the full truth, testify, and fully cooperate in any court hearing in Barbara Eccleston's criminal case where I am requested to testify. If requested by Japanese authorities, at the conclusion of any interview or testimony, I agree to sign a written statement in Japanese that accurately reflects my statements during the interview.

[6] In the approved PTA, the appellant agreed to "[w]aive the continued or future appointment and funding of all experts, including the previously approved expert consultants, with the exception of the Defense Mitigation Specialist, [Dr. TS], and the Defense Forensic Psychologist, [Dr. JY] as provided." The PTA then limited future funding of these two experts to writing reports, travelling to the proceedings, and consulting with the appellant and his counsel during the sentencing proceedings.

"[A]s a matter of military due process, servicemembers are entitled to investigative or other expert assistance when necessary for an adequate defense." *United States v. Garries*, 22 M.J. 288, 290 (C.M.A. 1986). Trial defense counsel made numerous requests for expert assistance, which were approved and provided by the Government: a forensic and clinical psychology expert on 4 May 2011; a DNA and bloodstain pattern expert on 11 May 2011; a Japanese translator on 11 May 2011; a mitigation specialist on 1 June 2011; a computer forensics expert on 11 June 2011; and an AFOSI special agent as a confidential defense investigator on 24 June 2011. The defense investigator was a forensic science consultant and chief death investigator for AFOSI.

The Article 32, UCMJ, hearing began on 30 August 2011. The defense's expert on DNA and blood stain analysis was unable to attend the hearing due to a medical problem. The defense requested a continuance, which was denied. The investigating officer noted the defense expert was provided the documentation of the scene and access to the crime scene. Prior to the Article 32, UCMJ, hearing, the defense's blood stain expert and defense investigator both visited the crime scene. Additionally, the Government's expert in blood stain analysis was available for the defense to interview. The investigating officer also made accommodations to allow trial defense counsel the opportunity to consult with their expert and to ensure he was available telephonically during the testimony by the Government's expert.

"A criminal defendant may knowingly and voluntarily waive many of the most fundamental protections afforded by the Constitution." *Mezzanatto*, 513 U.S. at 201. When an appellant waives a known right at trial, "it is extinguished and may not be raised on appeal." *United States v. Gladue*, 67 M.J. 311, 313 (2009) (citing *United States v. Harcrow*, 66 M.J. 154, 156 (C.A.A.F. 2008)). "In the absence of an explicit prohibition, a party may knowingly and voluntarily waive . . . a nonconstitutional right in a PTA." *Id.* at 314. We find no error in the appellant expressly agreeing to waive his right to expert consultants and witnesses at Government expense. By pleading guilty, the appellant extinguished his right to raise this issue on appeal. Again, as the appellant was the one who originated a similar provision, we are not inclined to deprive the appellant of the benefit of his bargain. *See* Weasler, 43 M.J. at 16.

The appellant seeks to circumvent his explicit waiver in the PTA and the implicit waiver as part of the "waive all waivable motions" provision by arguing that the provisions had the effect of creating an "empty ritual." The appellant claims he was unable to cross-examine the Government's expert witnesses effectively as he was forced to forgo the assistance of his own experts. However, the Government's expert in blood stain analysis had testified at the Article 32, UCMJ, hearing. The appellant and his counsel had the benefit of their expert's advice at that time and the six months from the time of his appointment until the PTA was signed. The defense's mitigation specialist produced a 148-page mitigation report which the defense used as an exhibit. This provision did not result in an "empty ritual."

*d. Waiver of Additional Discovery*

The PTA contained a provision that the appellant agreed to "[w]aive my right to all future discovery with the exception of discovery pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and R.C.M. 701(a)(6) or any limitation by Rules for Courts-Martial (R.C.M.) 705(c)(1)(B)." As addressed above, an appellant may knowingly and voluntarily waive constitutional and procedural protections. However, "[t]here may be some evidentiary provisions that are so fundamental to the reliability of the factfinding process that they may never be waived without irreparably discredit[ing] the federal courts." *Mezzanatto*, 513 U.S. at 204 (citation and internal quotation marks omitted) (second alteration in original). The Supreme Court distinguished agreements that result in the admission of evidence as enhancing the truth-seeking function of trials and one that would deprive a court of relevant testimony. *Id.* The Supreme Court has upheld a plea bargain which required an appellant to waive his right to receive material impeachment evidence prior to entering a plea agreement when it also contained a provision that the Government would provide any information regarding the appellant's factual innocence. *See United States v. Ruiz*, 536 U.S. 622 (2002).[7]

This term of the PTA was entered into after the Article 32, UCMJ, hearing. The appellant had the services of both a defense mitigation specialist and an experienced investigator. The military judge specifically asked trial defense counsel if they had any discovery concerns and if they had received the entire discovery needed to prepare for the court-martial. Trial defense counsel said, "[W]e believe that we have received everything that we are entitled to receive as part of discovery, even [without] the right to move to compel it, we believe we still received it." The appellant indicated he had discussed this provision with trial defense counsel and had been able to develop the information he wanted to present during the sentencing proceedings. Trial counsel confirmed that even though the appellant had waived discovery they had provided to the appellant "every statement provided to us by any witness that's testifying that we believe to be relevant to this case."

As the court-martial continued, one issue developed regarding the waiver of discovery. Some of the Government's sentencing impact witnesses testified regarding issues that indicated they had mental health records. This prompted the military judge to ask additional questions of trial defense counsel, who indicated there were "some things" they were not aware of before the witnesses testified despite their earlier interviews. Trial defense counsel assured the military judge that they were able to present a "full and complete sentencing hearing." After all the evidence was presented, trial defense counsel again told the military judge they were able to put on a full and complete sentencing case. Before he announced the sentence, the military judge again asked the appellant if he

---

[7] Similarly, in a federal circuit case, an appellant was foreclosed from claiming that the Government's failure to disclose potentially relevant mitigation evidence in the death penalty phase invalidated his guilty plea. *Jones v. Cooper*, 311 F.3d 306, 315 (4th Cir. 2002).

wanted to withdraw from the PTA, and the appellant said he did not.  By that time both the appellant and trial defense counsel had full knowledge as to how each provision of the PTA applied in this particular case.  The appellant made a voluntary, knowing, and intelligent waiver of his right to further discovery with sufficient awareness of the relevant circumstances and its consequences.  *See Brady*, 397 U.S. at 748.

The effect of the provision in this court-martial was that it limited the production of possible impeachment evidence.  Some of the witnesses testified as to how the murder affected them, and their mental health records might have been discoverable.  Trial counsel has an obligation to disclose evidence favorable to the defense when it would reduce the punishment.  R.C.M. 701(a)(6)(C).  However, mental health records are privileged and only releasable when either the patient waives the privilege or the military judge determines that an exception applies.  Mil. R. Evid. 513.  At best, the appellant proffers the mental health records may have revealed the witnesses had more than one reason for seeking counseling unrelated to the horrific and senseless murder of their friend.  While recognizing we do not have the mental health records to review, we find the record as a whole compellingly demonstrates that such records of the friends and family members of the victim would not have reduced the appellant's punishment.  *See Ginn*, 47 M.J. at 248.  We find the provision, as applied to this case, did not convert this proceeding into any empty ritual and did not violate public policy.

*Trial Counsel's Sentencing Argument*

The appellant's next assignment of error alleges trial counsel made improper statements during sentencing argument.  We considered all the issues raised by the appellant and specifically address three aspects of trial counsel's argument:  (1) trial counsel's inferences from the evidence; (2) his reference to the appellant as "a coward," "pathetic," and a "waste of space"; and (3) his reference to Ms. Eccleston as a "witch." We disagree that these remarks constituted improper argument.

TSgt DG testified that the appellant kept the victims' family in his prayers and prayed for them every day.  A recording of a phone conversation between the appellant and his mother from the confinement brig also contained statements from the appellant that he prayed for the victim's family.  In the same phone call to his mother, the appellant complained about the victim's mother testifying at the Article 32, UCMJ, hearing. During sentencing argument, trial counsel linked these two concepts and argued that the prayers for the family were not prayers of condolence but of condescension.

The appellant stabbed the victim in the back of the neck.  The stab wound injured the skin, tissue, and muscle and was in a location that, had it been deeper, would have severed the spinal cord and caused instantaneous death.  This injury did not significantly contribute to the victim's death.  There were four other sharp force injuries that directly contributed to the victim's death:  three cutting wounds to the left, right, and front of his

neck, and a stabbing wound to the right side of the neck. The victim's blood was on the couch in the living room. Special Agent SR testified that the blood in the living room was due to either an injury to the victim prior to his trachea being compromised or was a transfer from the appellant. Trial counsel argued the appellant stood over the victim as he was lying on the sofa and made this first stabbing wound to incapacitate him.

Trial counsel referred to the appellant as "a coward and a pathetic murderous person," and to him and Ms. Eccleston as "two pathetic wastes of space." Trial defense counsel objected and trial counsel countered that the appellant referred to himself as a coward and pathetic in his admitted confession. The military judge overruled the objection.

Trial defense counsel never objected to trial counsel referring to Ms. Eccleston as a "witch." Trial defense counsel described her as someone who "lies through her teeth" and also referenced her spell-casting at the beginning of the murder plan.[8]

Whether argument is improper is a question of law. *United States v. Marsh*, 70 M.J. 101, 104 (C.A.A.F. 2011) (citing *United States v. Pope*, 69 M.J. 328, 334 (C.A.A.F. 2011)). "The standard of review for an improper argument depends on the content of the argument and whether the defense counsel objected to the argument." *United States v. Erickson*, 63 M.J. 504, 509 (A.F. Ct. Crim. App. 2006), *aff'd*, 65 M.J. 221 (C.A.A.F. 2007). Where trial defense counsel has objected to the argument, we review de novo whether the statements were erroneous and materially prejudicial to the substantial rights of the appellant. *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000). If trial defense counsel failed to object to the argument at trial, we review for plain error. *Marsh*, 70 M.J. at 104. To establish plain error, the appellant must prove: "(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right." *Id.* (citation and internal quotation marks omitted).

"A trial counsel is charged with being a zealous advocate for the Government." *United States v. Barrazamartinez*, 58 M.J. 173, 176 (C.A.A.F. 2003) (citing *United States v. Nelson*, 1 M.J. 235, 238 (C.M.A. 1975)). As a zealous advocate, trial counsel may "argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *Baer*, 53 M.J. at 237 (citing *Nelson*, 1 M.J. at 239). "'[T]rial counsel is at liberty to strike hard, but not foul, blows.'" *Id.* at 237 (citing *United States v. Edwards*, 35 M.J. 351 (C.M.A. 1992)). Accordingly, trial counsel may not "unduly . . . inflame the passions or prejudices of the court members," *United States v. Clifton*, 15 M.J. 26, 30 (C.M.A. 1983) (citations omitted); inject irrelevant matters, such as personal opinions or facts not in evidence, *United States v. Fletcher*, 62 M.J. 175, 180, 183 (C.A.A.F. 2005); invite punishment for uncharged misconduct, *United States v.*

---

[8] Evidence had earlier been introduced that Ms. Eccleston attempted to practice witchcraft and to cast a spell on her husband to hurt him.

*Schroder*, 65 M.J. 49, 58 (C.A.A.F. 2007); comment upon the accused's exercise of his or her constitutionally protected rights, *United States v. Paxton*, 64 M.J. 484, 487 (C.A.A.F. 2007) (citations omitted); or treat an accused's duty position as a matter in aggravation absent a connection between the member's position and the offense, *United States v. Bobby*, 61 M.J. 750, 756 (A.F. Ct. Crim. App. 2005). Stated conversely, trial counsel is limited to arguing the evidence in the record and the inferences fairly derived from that evidence. *See Paxton*, 64 M.J. at 488; *United States v. White*, 36 M.J. 306, 308 (C.M.A. 1993). The objected language must be viewed within the context of the court-martial and the argument as a whole, not isolated words or phrases. *Baer*, 53 M.J. at 238; *see United States v. Rodriguez*, 28 M.J. 1016 (A.F.C.M.R. 1989).

Here, the arguments by trial counsel were well within bounds. The inferences from the evidence were fairly derived from the evidence in the record. The evidence supported a conclusion that the first blow was a stabbing wound to the back of the neck while the victim was asleep and prone on the sofa. The evidence also supported an inference that the appellant was not remorseful and that his prayers were for his personal convenience. Trial counsel may comment on an accused's lack of remorse when there is evidence in the record that may raise that inference. *Paxton*, 64 M.J. at 487. Sufficient evidence exists in this record to support that inference.

"Disparaging comments are . . . improper when they are directed to the defendant himself." *Fletcher*, 62 M.J. at 182. We review the context of the entire court-martial to determine whether or not comments are fair. *United States v. Gilley*, 56 M.J. 113, 121 (C.A.A.F. 2001) (citations omitted). We conclude that the limited references to the appellant and his co-conspirator with disparaging terms were not outside the bounds of fair comment or beyond the norm. *Cf. United States v. Erickson*, 63 M.J. 504 (A.F. Ct. Crim. App. 2006) (comparisons to Adolph Hitler, Saddam Hussein, Osama bin Laden, and the devil were outside bounds). In this case, trial counsel was using the same language the appellant used to refer to himself and other evidence in the record regarding his co-conspirator. *See United States v. McPhaul*, 22 M.J. 808 (A.C.M.R. 1986) (references to appellant as degenerate scum, slavering animal, subhuman, and miserable human being were based on evidence in the record and were fair comment). We find trial counsel's use of these terms that were in evidence is not outside the norms of fair comment in a court-martial where the appellant has pled guilty to murder and conspiracy to commit murder as described in detail above.

*Display of Victim's Photograph*

Prosecution Exhibit 2 is a photograph of the victim. He is wearing his Air Force uniform, smiling, and the American flag is displayed behind him. Trial defense counsel did not object to its admission but did object to its being displayed during the court-martial. The military judge overruled the objection. SSgt RB was a close friend of the victim and testified at the court-martial about the impact the murder had on him. On

cross-examination, he described the effect the exhibit had on him: that he felt he owed it to his friend to testify, and that he hoped his testimony might be substantive. The military judge later clarified the display of the exhibit would not influence his decision on an appropriate sentence but instead would be determined by the evidence that was admitted.

As the sentencing authority, the military judge is presumed to know the law and apply it correctly, absent clear evidence otherwise. *United States v. Sanders*, 67 M.J. 344, 346 (C.A.A.F. 2009) (citations omitted). We presume a military judge follows his own rulings. *Id.* (citations omitted). If there is an error of law with respect to the sentence, the appellant is only entitled to relief if the error materially prejudices his substantial rights. Article 59(a), UCMJ, 10 U.S.C. § 859(a). The test for prejudice is whether the error substantially influenced the adjudged sentence. *Sanders*, 67 M.J. at 346 (citations omitted). The exhibit was properly admitted. There is no error in having sentencing witnesses testify about admitted exhibits. There is no evidence the military judge gave the display of the exhibit any weight in determining an appropriate sentence in this case. We find no error in the display of the exhibit, and even if there was error, we find the display did not substantially influence the adjudged sentence.

*Sentence Appropriateness*

This Court "may affirm only . . . the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." Article 66(c), UCMJ, 10 U.S.C. § 866(c). We review sentence appropriateness de novo, employing "a sweeping Congressional mandate to ensure 'a fair and just punishment for every accused.'" *United States v. Baier*, 60 M.J. 382, 384 (C.A.A.F. 2005) (citations omitted). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offenses, the appellant's record of service, and all matters contained in the record of trial." *United States v. Bare*, 63 M.J. 707, 714 (A.F. Ct. Crim. App. 2006), *aff'd*, 65 M.J. 35 (C.A.A.F. 2007). We have a great deal of discretion in determining whether a particular sentence is appropriate, but we are not authorized to engage in exercises of clemency. *United States v. Healy*, 26 M.J. 395, 395-96 (C.M.A. 1988).

We considered the entire record of trial. Our review included the appellant's unsworn statement, his enlisted performance reports, the defense exhibits submitted at trial, and the matters submitted during clemency. We also considered the facts of the offense to which the appellant pled guilty as explained in detail above and all other properly admitted matters. Based on the review of the entire record of trial, we have determined that the adjudged and approved sentence is appropriate.[9]

---

[9] "Absent evidence to the contrary, accused's own sentence proposal is a reasonable indication of its probable fairness to him." *United States v. Hendon*, 6 M.J. 171, 175 (C.M.A. 1979) (citing *United States v. Johnson*, 41 C.M.R. 49, 50 (C.M.A. 1969)). Of course, a court-martial can adjudge a sentence less than the limits in a PTA

*Post-Trial Processing Delays*

Though not raised as an issue on appeal, we note the overall delay of more than 540 days between the time of docketing and review by this Court is facially unreasonable. *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). Article 66(c), UCMJ, empowers the service courts to grant sentence relief for excessive post-trial delay without the showing of actual prejudice required by Article 59(a), UCMJ. *United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). Having considered the totality of the circumstances and the entire record, we find the appellate delay in this case was harmless beyond a reasonable doubt. *Moreno*, 63 M.J. at 135-36 (reviewing claims of post-trial and appellate delay using the four-factor analysis found in *Barker v. Wingo*, 407 U.S. 514, 530 (1972)). Furthermore, given the totality of the circumstances and the entire record, we conclude that sentence relief is not justified. *United States v. Harvey*, 64 M.J. 13, 24 (C.A.A.F. 2006); *Tardif*, 57 M.J. at 224.

*Conclusion*

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ. Accordingly, the approved findings and sentence are

AFFIRMED.



FOR THE COURT

STEVEN LUCAS
Clerk of the Court

---

and may consider sentencing factors distinct from those in front of the convening authority. *Id.* An appellant who has been prejudiced by error may be entitled to sentence relief even if the adjudged sentence is less than limitation in the PTA. *United States v. Kinman*, 25 M.J. 99 (C.M.A. 1987). We recognize that the application of *Hendon* has been limited by our Navy colleagues in *United States v. Brandon*, 33 M.J. 1033 (N.M.C.M.R. 1991), and again in *United States v. Payne*, 1996 WL 927728, (N.M.C.M.R 1996). We have previously cited *Hendon* and relied on its rationale. *See United States v. El-Amin*, 38 M.J. 563 (A.F.C.M.R. 1993). In this case, we are able to perform our sentence appropriateness assessment without reference to the PTA limitation, and thus do not need to rule on the weight, if any, to be given to the sentence limitation in a pretrial agreement when there is no error.