# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40689**

————————————

**UNITED STATES**
*Appellee*

**v.**

**William J. FUNDIS**
Major (O-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 29 January 2026

————————————

*Military Judge*: Adam D. Bentz.

*Sentence*: Sentence adjudged on 27 June 2024 by GCM convened at Scott Air Force Base, Illinois. Sentence entered by military judge on 15 August 2024: Dismissal, confinement for 40 months, and a reprimand.

*For Appellant*: Major Jordan L. Grande, USAF; Frank L. Spinner, Esquire.

*For Appellee*: Colonel Matthew D. Talcott, USAF; Lieutenant Colonel Jenny A. Liabenow; Major Vanessa Bairos, USAF; Major Regina Henenlotter, USAF; Major Kate E. Lee; Captain Heather R. Bezold, USAF; Captain Donnell D. Wright, USAF; Mary Ellen Payne, Esquire.

Before GRUEN, BREEN, and MORGAN, *Appellate Military Judges*.

Judge BREEN delivered the opinion of the court, in which Senior Judge GRUEN and Judge MORGAN joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

BREEN, Judge:

A military judge sitting as a general court-martial convicted Appellant, consistent with his pleas and pursuant to a plea agreement, of two specifications of assault consummated by a battery upon his spouse, in violation of Article 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928;[1] and eight specifications of domestic violence, in violation of Articles 128b, UCMJ, 10 U.S.C. § 928b.[2]

The military judge sentenced Appellant to a dismissal, confinement for 40 months, and a reprimand.[3] Appellant requested the convening authority defer confinement for a period of three days, which the convening authority denied. Appellant also requested waiver of all automatic forfeitures for a period of six months for the benefit of his dependents. The convening authority waived all automatic forfeitures for a period of six months, release from confinement, or expiration of term of service, whichever was sooner, with the waiver commencing on the date of the decision on action. The convening authority took no action on the findings or sentence and provided the language for the reprimand.

Appellant raises one issue on appeal, which we have reworded: whether Appellant's sentence that included a dismissal is inappropriately severe. We find no error materially prejudicial to Appellant's substantial rights and affirm the findings and sentence.

## I. BACKGROUND

Appellant entered active duty on 28 May 2010, and he was assigned to Fort Campbell, Kentucky, at the time of all the offenses.

### A. Victim AF

Appellant met his first wife, AF, in 2005 while they attended college in Arizona. They married in 2009 and share three minor children. In July 2020, AF joined Appellant in the Fort Cambell, Kentucky, area, after his transfer from

---

[1] Unless otherwise noted, all references to the UCMJ and to the Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Pursuant to the plea agreement, Appellant pleaded guilty by exceptions and substitutions to certain words from three of the eight specifications of domestic violence. Following acceptance of Appellant's guilty pleas, the Government "withdr[ew] and dismissed without prejudice (to ripen into with prejudice upon the completion of the general court-martial)" eight other specifications of domestic violence in violation of Article 128b, UCMJ, and one specification of obstruction of justice in violation of Article 131b, UCMJ, 10 U.S.C. § 931b.

[3] Appellant was credited with 197 days of pretrial confinement.

an unaccompanied assignment in South Korea. During the course of their marriage, Appellant committed five violent offenses against AF, which comprised his guilty plea to Charge I and its two specifications and Charge II and its three specifications.[4]

### 1. Charge I – Article 128 Specifications

The first incident occurred between 1 July 2020 and 31 August 2020. The couple were staying in a temporary home in the neighboring town of Clarksville, Tennessee, while searching for a home in the Fort Campbell area. During this time, Appellant and AF engaged in several verbal arguments and experienced "a lot of turbulence" in their marriage. On one occasion, Appellant and AF engaged in a verbal dispute while lying in bed. Appellant became upset after one of AF's comments, and expected her to apologize. When AF got "defensive" and failed to apologize, Appellant quickly got on top of her and slapped AF in the face. As a result of the slap, AF sustained bruising on her lip and chin and pain in her right ear.

The second incident occurred on 27 December 2021, after they moved into a home in Clarksville, Tennessee. The couple had been apart for nearly a year while Appellant was deployed and AF was in training with the Air Force Reserves.[5] The couple began arguing off and on throughout the day, including one instance where AF called the police to the house. Eventually, after the police left the home and no one was arrested, a new verbal argument started in the walk-in closet of their master bedroom because Appellant wanted AF to take responsibility for the events that occurred earlier that day. As AF tried to walk past him to leave, Appellant pushed AF down to the floor and restrained her by placing his knee onto her chest, while he continued to yell at her. As a result of this assault, AF sustained bruising to her torso.

### 2. Charge II – Article 128b Specifications

The final incident involving AF occurred on 5 February 2022, in Las Cruces, New Mexico, and involved three different violent offenses. At the time of the incident, AF was in military training and the relationship. Appellant and

---

[4] On 26 January 2022, the President signed an executive order which amended certain provisions of the Manual for Courts-Martial, to include a new paragraph 78a of the Uniform Code of Military Justice—Article 128b, UCMJ, *Domestic Violence*—outlining, *inter alia*, the elements of the offense and maximum punishments to be imposed. *See* Exec. Order No. 14,062, 3 C.F.R. 4763 (31 Jan. 2022). The conduct charged in Appellant's case under Article 128, UCMJ, for assault consummated by a battery on a spouse, all occurred prior to this date.

[5] AF attended Basic Military Training for her entry into the Air Force Reserves in July 2021.

AF were living apart and the relationship was headed toward divorce. Regardless, Appellant flew out to New Mexico to spend time with AF for her birthday. Once Appellant arrived in New Mexico, he picked AF up from her dorm room, and they drove two hours to Las Cruces, where they had reserved a hotel room.

While out celebrating her birthday, AF started to have issues with her stomach after dinner. Appellant did not think the issue was that serious and began driving them to one of the bars in Las Cruces to continue celebrating her birthday. AF told Appellant that she did not want to go out and wanted him to drive her back to the hotel. Appellant tried to get her to agree to stay out, and she became "agitated" that he would not drive her back to the hotel. AF made a sarcastic comment to Appellant, and he immediately pulled over at a gas station. Appellant and AF began arguing and calling each other names until AF departed the vehicle, slammed the door, and walked into the gas station.

Appellant waited for AF outside, and after she emerged from the gas station they began to argue again. Appellant then grabbed AF around her neck with one hand and pulled her towards the car. AF began to cry and complained about the pain, while Appellant told her, "Oh good motherf[**]ker." Appellant then tried to get her into the passenger seat, but AF pulled away from Appellant's grasp and ran back inside the gas station to call a driver to pick her up. After the car arrived, Appellant followed the driver back to their hotel.

After arriving at the hotel, AF went inside their hotel room and locked the door. Shortly thereafter, Appellant went to the room, knocked on the door, apologized to AF, and asked to come in. AF let him into the room, and they started a new argument. Appellant suggested that it might be best if they just drove back to AF's dorm but AF interjected that she could just get a male friend to come pick her up. This comment made Appellant very emotional, and he grabbed one of AF's bags and threw it across the room. Appellant then flipped over a coffee table before moving toward AF. After reaching her, he grabbed AF's wrists forcefully and shoved her backwards hitting AF in the face as a result. Appellant then gave her a shove that caused AF to fall to the floor. After she hit the floor, Appellant kicked AF in her buttocks. Appellant left the premises and went to a different hotel. As a result of his actions that night, AF suffered bruising near her eye, her neck, and buttocks. AF also had scratches on her upper chest. AF testified that she suffered pain in her throat that was later diagnosed as a broken hyoid bone.[6]

---

[6] Whether Appellant was the source of the broken hyoid bone was strongly contested during Appellant's court-martial as to whether it was evidence in aggravation that would be relevant for sentence consideration. Although we considered this injury,

After the 5 February 2022 incident, Appellant and AF continued to talk while they were separated. Appellant indicated that he was willing to change and he was "starting a new cycle" and would "never lay a hand on [her] again." Despite these efforts, the marriage could not be saved and the couple divorced in April 2023.

As a result of these incidents involving AF, on 15 December 2022, Appellant's commander preferred the two specifications of Charge I (assault consummated by a battery upon his spouse) and three specifications of Charge II (domestic violence), described *supra*. Two specifications of Charge III, violation of Article 131b, UCMJ, were also preferred. An Article 32, UCMJ, 10 U.S.C. § 832, preliminary hearing was held on 3 May 2023. Charges were referred to a general court-martial on 21 July 2023, with the trial originally docketed for 11 December 2023.

**B. Victim SF**

Appellant began dating SF in September 2022. Over the course of their relationship, Appellant committed several acts of domestic violence against SF, forming the basis for referral of 11 specifications of the Additional Charge in violation of Article 128b, UCMJ. Appellant pleaded guilty to five of the 11 specifications of domestic violence against SF.

On 23 December 2022, while still dating, Appellant and SF visited Appellant's sister in Gilbert, Arizona, so he could "show her off" to his family. During a discussion in the living room, Appellant became upset with something SF said, and he left to go to a guest bedroom. When SF went to the room later that night an argument ensued. At the end of the argument, SF told Appellant she wanted to end their relationship. In response, Appellant grabbed SF by the arms and threw her on the bed. He then pinned her down while screaming at her.

The second incident occurred on 5 May 2023. Appellant and SF were now engaged, and they travelled to Myrtle Beach, South Carolina, with his three children and SF's two children to attend a cheerleading competition. While staying at a local rental home, Appellant and SF got into a verbal argument. Toward the end of the argument, SF told Appellant that she wanted to end the relationship, and she threw her engagement ring across the room. Appellant became angry, grabbed SF, and threw her onto the bed. Like the first incident,

---

whether AF suffered the injury in New Mexico or on a different occasion unrelated to Appellant, was less important than the sustained level of violence in our review. We found the sustained level of violence over time and with multiple victims more important to our consideration than the specific diagnostic result from one of many violent attacks of Appellant's spouses.

Appellant pinned SF down on the bed by grabbing her wrists and screaming at her.

The next incident occurred on 19 May 2023, a mere two days after their wedding. Appellant and SF travelled to Wesley Chapel, Florida, to spend time with SF's parents at their home. During the visit, Appellant and SF got into a verbal argument because SF felt "disrespected" and "ignored." Appellant began arguing more "aggressively" and pushed her down on the bed. In response, SF told Appellant that she wanted an annulment. Appellant became extremely upset and grabbed SF by her upper arm and hair. He then forced her down the stairs so they could discuss their issue with her parents. Appellant could tell SF experienced "discomfort" as he walked her down the stairs.

On 6 July 2023, Appellant's unit hosted an event, so Appellant and SF booked two rooms in a hotel, with one for the couple and the other room for SF's children. That night Appellant and SF got into a verbal argument, and SF spent the night with her children in the other room. The next morning, SF went to Appellant's room and saw things on his phone that made her upset. SF confronted Appellant about what she had found, and she told him she did not want to be with him anymore. In response, Appellant pushed SF onto the bed, pinned her down with his body, pulled her cheek with his fingers, and struck SF in the face with his head. As a result of his actions, SF suffered bruising to her eye and arm.

After the 6 July 2023 incident, Appellant and SF exchanged text messages wherein he tried to mend their issues. SF expressed her belief that Appellant broke her trust and his previous promise that he "would not hurt [her] again." In return, Appellant expressed his remorse and his desire to take "responsibility." Appellant promised, "I will be a good husband to you."

The final incident occurred on 29 October 2023. SF surprised Appellant with tickets to a Dallas Cowboys game, and the couple traveled to Arlington, Texas to watch the game. After leaving the game, Appellant and SF began arguing in the car as they drove away from the stadium. When Appellant reached a red light, SF tried to open the car door and exit, but Appellant grabbed her and pulled her back into the car. Once the car began moving, SF tried to move to the back seat and exit the car. Appellant continued to hold SF to keep her in the car. SF swung at Appellant and struck Appellant above his eye, leaving a cut. Appellant pulled into the parking lot of a gas station, got into the backseat and pressed his body weight onto SF to control her movement. Appellant apologized for his actions and told her he was sorry.

On 8 December 2023, SF made an unrestricted report of domestic violence against Appellant. Due in part to this report, Appellant was placed in pretrial

confinement and his original case was continued. It was this time that the Additional Charge and its eleven specifications of domestic violence involving SF were preferred and referred. The couple has remained separated since December 2023.

## C. Presentencing Proceedings

Prior to his trial, Appellant spent 197 days in pretrial confinement and entered into a negotiated plea agreement, wherein he agreed to plead guilty to the charges and specifications as detailed above in return for a total period of confinement not to exceed four years, and Appellant agreed "[t]he Court may adjudge a dismissal." Appellant also agreed to enter into a stipulation of fact, which included a detailed breakdown of the facts surrounding the charges and specifications, photographs of the victims' injuries, audio recordings of Appellant's admissions to the victims, and text messages.

As part of the Government's presentencing case, the Government introduced Appellant's stipulation of fact with attachments, Appellant's personal data sheet, and officer performance reports. The Government also presented testimony from an expert in forensic nursing regarding Appellant's assaults of AF, two members of Appellant's unit to discuss unit impact, and AF to provide additional information about the offenses Appellant committed upon her. The military judge also accepted victim impact statements from AF and SF, pursuant to Rule for Courts-Martial (R.C.M.) 1001(c), describing how Appellant's actions impacted their lives. Appellant presented character letters and witness testimony addressing his rehabilitation potential as well as evidence of his military accomplishments. He also presented copies of mental health records, which outlined his diagnosis of major depressive disorder and post-traumatic stress disorder, along with the stressors he was experiencing due to marital issues and the legal process. Finally, Appellant made an unsworn statement in which he discussed the events, his remorse, and his belief that the trauma he experienced during a combat deployment caused him to lose his "morality."

## II. DISCUSSION

## A. Sentence Severity

### 1. Law

This court reviews issues of sentence appropriateness de novo. *See United States v. McAlhaney*, 83 M.J. 164, 166 (C.A.A.F. 2023) (citing *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006)). We may affirm only so much of the sentence as we find correct in law and fact. Article 66(d), UCMJ, 10 U.S.C. § 66(d). When conducting our review, we not only consider the appropriateness of the entire sentence, but also "must consider the appropriateness of each segment of a segmented sentence." *United States v. Flores*, 84 M.J. 277, 281 (C.A.A.F. 2024).

"We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (en banc) (per curiam) (alteration in original) (citation omitted).

In sentencing an accused, Article 56(c)(1), UCMJ, 10 U.S.C. § 856(c)(1), dictates that a court-martial shall impose punishment that is sufficient, but not greater than necessary to promote justice and to maintain good order and discipline in the armed forces. In making this determination, the sentencing authority will consider the sentencing factors listed in Article 56(c)(1)(C), UCMJ, and R.C.M. 1002(f)(3), which include the need for the sentence to reflect the seriousness of the offense, promote respect for the law, promote adequate deterrence of misconduct, and rehabilitate the accused, among others.

In plea agreement cases, "[a]bsent evidence to the contrary, [an] accused's own sentence proposal is a reasonable indication of its probable fairness to him." *United States v. Cron*, 73 M.J. 718, 736 n.9 (A.F. Ct. Crim. App. 2014) (quoting *United States v. Hendon*, 6 M.J. 171, 175 (C.M.A. 2979)) (additional citation omitted). Thus, when considering the appropriateness of a sentence, courts may consider that a plea agreement – to which an appellant agreed – placed limits on the sentence that could be imposed. *United States v. Fields*, 74 M.J. 619, 625 (A.F. Ct. Crim. App. 2015). However, a sentence within the range of a plea agreement may be inappropriately severe. *See id.* at 626.

"An accused's own sentence proposal is a reasonable indication of the sentence's probable fairness to the accused." *United States v. Arroyo*, 86 M.J. 89, No. 24-0212, 2025 CAAF LEXIS 688, at *2 (C.A.A.F. 19 Aug. 2025). "Accordingly, [we] may—to ascertain the fairness and thus the appropriateness of an adjudged sentence—consider the context in which the parties reached the plea agreement, including the benefits from that agreement to the accused." *Id.*

Recognizing the benefits an appellant received as part of a plea agreement is "entirely proper as part of [this court's] de novo determination of whether the punishment dictated by the plea agreement and imposed by the military judge was appropriate." *Id.* at *12.

Although the Courts of Criminal Appeals are empowered to "do justice" we are not authorized to grant mercy. *United States v. Guinn*, 81 M.J. 195, 203 (C.A.A.F. 2021) (citation omitted). In the end, "[t]he purpose of Article 66[ ], UCMJ, is to ensure 'that justice is done and that the accused gets the punishment he deserves.'" *United States v. Sanchez*, 50 M.J. 506, 512 (A.F. Ct. Crim. App. 1999) (quoting *United States v. Healy*, 26 M.J. 394, 395 (C.M.A. 1988)).

**2. Analysis**

Appellant asserts the sentence of a dismissal, which was permissible under his plea agreement, is inappropriately severe because it was not "'necessary' to promote justice or to maintain good order and discipline in the armed forces." Appellant argues that the portion of his sentence that included confinement for 40 months was a "severe" punishment that reflects the seriousness of the offense that promoted both respect for the law and adequate deterrence of misconduct. Appellant further asserts that the dismissal ignored the "considerable steps" he took towards rehabilitation, provided no discernable positive impact for the victims, and resulted in significant long-term impacts. Therefore, the portion of the sentence providing for a dismissal is "greater than necessary" to achieve a just sentence. We are not persuaded by Appellant's arguments and find that the sentence is not inappropriately severe.

We have considered the nature and seriousness of the offenses and have given individualized consideration to Appellant, including evidence of his mental health history and post-deployment struggles, record of service, acceptance of responsibility, and pleas of guilty. We find that the portion of his sentence which included a dismissal is not an inappropriately severe punishment for Appellant who physically assaulted two different women he married, on ten different occasions, over the course of three years. These crimes occurred after multiple instances where Appellant promised his wives that he would change his behavior. Significantly, the five instances of physical assault he committed against SF occurred after his commander preferred charges against him for physically assaulting his first wife AF. This history shows that previous promises of reform and a pending court-martial were insufficient motivations for Appellant to change his violent behavior. Finally, in considering whether the sentence was appropriate, we considered the fact that Appellant bargained for this sentence in his plea agreement and benefited from a guarantee he would serve no additional confinement and would be shielded from being prosecuted for eight other charges of domestic violence and an obstruction of justice charge.

We have carefully considered Appellant, the nature and seriousness of the offenses, Appellant's record of service, and all matters contained in the record of trial. *See Sauk*, 74 M.J. at 606. Therefore, we do not find Appellant's sentence to be inappropriately severe.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to Appellant's substantial rights occurred. Articles

59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d).[7] Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court

---

[7] Although not raised by Appellant, we note that the record of trial indicates that it does not contain a copy of the recording of the preliminary hearing for the original charges involving AF. R.C.M. 405(j)(5) required the Government to ensure the preliminary hearing is recorded and R.C.M. 405(j)(2)(b) requires this recording be included as part of the preliminary hearing report. Appellant has not claimed prejudice from this omission, and we find none. Additionally, there is no indication in the record that Appellant or his counsel received a copy of the record of trial, as required by R.C.M. 1112(e)(1). Appellant has not raised error on this issue and we find none. Moreover, despite these omissions we were able to complete our Article 66(d), UCMJ, review.